HOWARD UNIVERSITY, Appellant,

v.

LuEthel Tate GREEN, Appellee.

No. 93–CV–18.

District of Columbia Court of Appeals.

Argued Oct. 26, 1994.
Decided Dec. 22, 1994.

KING, Associate Judge:

In this civil action for retaliatory termination of employment, appellant Howard University Hospital ("Howard University" or "Hospital"), the former employer of appellee LuEthel Tate Green ("Green"), seeks reversal of a judgment in favor of Green, or in the alternative, a new trial. Howard University contends the trial judge erred in denying its post trial motion for judgment notwithstanding the verdict ("JNOV") because Green failed to make out a prima facie case for retaliation under the District of Columbia Human Rights Act ("DCHRA"). Alternatively, Howard University claims the trial court's erroneous admission of rumors concerning the homosexuality of certain Hospital employees, including Green's supervisor, so prejudiced the jury that it was unable to fairly decide the case on the merits, thus entitling it to a new trial.

For the reasons set forth below, we hold that Green did not establish her prima facie case for retaliation; accordingly, we reverse the trial court's denial of Howard University's motion for JNOV.

Janet Pitterle Holt, with whom Susan L. Riley, Washington, DC, was on brief, for appellant.

Alan Banov, Washington, DC, for appellee.

Before SCHWELB, KING, and KENNEDY\*, Associate Judges.

## I.

Green, a former Associate Director of Nursing at Howard University Hospital, brought this action under the DCHRA, claiming she had been included in a reduction-in-force ("RIF") in retaliation for complaining of alleged sexual orientation discrimination in the Division of Nursing.[1] Specifi-

---

\* Sitting by designation pursuant to D.C.Code 1973, § 11–707(a).

1. In August 1990, based on her inclusion in the RIF, Green filed a complaint in the United States District Court for the District of Columbia (Civil Action No. 90–2014) alleging Howard University discriminated against her on the basis of sexual orientation and failed to comply with its Employee Handbook in implementing the RIF. In a Memorandum Order dated July 9, 1992, the court granted Howard University's motion for summary judgment on the discrimination claim because it found Green failed to establish a prima facie case of discrimination. In a further Memorandum Order, dated October 22, 1992, the court granted Howard University's motion for summary judgment on the breach of contract claim because it found Green failed to present a genuine issue of material fact and that Howard University was entitled to judgment as a matter of law.

Green appealed to the United States Court of Appeals for the District of Columbia Circuit (No. 92–7231) and in a Judgment and Order issued on March 31, 1994, that court affirmed the District Court as to the discrimination claim, agreeing that Green failed to make out a prima facie case of sexual orientation discrimination. As to the breach of contract claim, the Court of Appeals decided to hold its decision in abeyance pending the decision of this court in the instant case (*Howard University v. Green*, No. 93–CV–0018).

In April 1991, Green filed this action in the Superior Court of the District of Columbia, alleging she had been included in the reduction-in-force in retaliation for complaining of sexual orientation discrimination (No. 91–CA04194). Following a jury trial and a verdict in Green's favor on June 15, 1992, Howard University noted this appeal.

cally, Green alleged her immediate supervisor, who was the Director of Nursing ("Director") and the organizer of the RIF, maintained homosexual relationships with another Associate Director of Nursing ("Associate Director"), and a Patient Care Coordinator ("Coordinator"), a subordinate of Green's, neither of whom were included in the RIF, and that Green was included in the RIF because she complained of these relationships.

Green alleged that throughout her twenty years of employment with the Hospital, the Director frequently showed partiality to both the Associate Director and the Coordinator by granting them extensive overtime pay, liberal sick leave, choice working assignments, and lenient disciplinary action. Green frequently complained of this favoritism, verbally and in writing, to the Director, and on a few occasions, to other Hospital managers, suggesting it undermined her authority, contradicted Hospital policy, and adversely affected department morale. Green conceded at trial that she never explicitly linked these complaints to the alleged homosexual activity or directly complained of sexual orientation discrimination. Nonetheless, she maintains that because of so-called "rampant rumors" of homosexual activity among the three women, the Director knew that Green's otherwise work-related complaints were actually complaints of sexual orientation discrimination.

Over Howard University's objections, the trial court permitted Green to present testimony concerning the rumors of homosexuality among the women to establish that Green was actually protesting preferential treatment of homosexuals. Specifically, the trial court found that a taped conversation between the Director and Green, in which Green remarked "that the grapevine rumor mill had not been kind to [the Director] ... and that she was sick of rumors of 'Ms.

[Director] this, Ms. [Coordinator] that,'" was sufficiently clear to place the Director, and thus, the Hospital, on notice that: (1) Green was referring to rumors of alleged homosexuality and, therefore, (2) Green was actually complaining of sexual orientation discrimination.

Also over appellant's objection, the trial court permitted Green to establish that she reasonably believed the favoritism exhibited by the Director was based on homosexual preferences by admitting evidence of: (1) sexual orientation-neutral facts about the women's social activities, such as their taking shopping trips together, their practice of occasionally spending nights in each others' homes, and their dining together; (2) personal facts about the women, such as their marital status, mode of dress, and the length of the friendship among them; and (3) homosexual stereotypes such as the belief that homosexuals can be identified by their appearance, and the view that the provision of financial assistance equates to playing the "male role." At trial, however, the Director unequivocally testified she was not homosexual and had never engaged in homosexual relations with any woman.[2]

After the nearly four-week trial the jury returned a verdict in favor of Green, awarding her $140,000. In a lengthy Memorandum Opinion, the trial court denied Howard's motions for JNOV and a new trial, holding that Green made out a prima facie case of retaliation and the admission of rumors of homosexuality was not overly prejudicial. This appeal followed.

## II.

■ The dispositive issue in this appeal is whether evidence of mere rumors, regardless of how pervasive and long-established, and a taped conversation vaguely referencing such

---

**2.** At trial, neither the Associate Director nor the Coordinator were asked to state their sexual orientation. However, in sworn affidavits attached to a pretrial motion filed by Howard University, each women, as well as the Director, stated that she was not then homosexual, never had been homosexual, and had never engaged in homosexual activity with any female at any time. Further, in these affidavits, and in depositions also attached to the pretrial motion, each woman swore she had never taken part in any sexual or physical relationships or activity with either of the other two women. Moreover, uncontradicted testimony established that the Director has one child and lived with the child's father in the late 1960's; the Associate Director was divorced with one child; and the Coordinator was divorced.

rumors, provides a sufficient basis on which a jury can reasonably conclude that otherwise work-related complaints rise to the level of activity protected by the DCHRA. In resolving this question we look for guidance to our cases addressing retaliation under the DCHRA and to retaliation case law under federal employment discrimination legislation analogous to the DCHRA ("Title VII").[3]

### A.

▇▇▇ Under the DCHRA[4] it is an unlawful discriminatory practice for an employer to retaliate against a person on account of that person's opposition to any practice made unlawful by the DCHRA. *See Young v. Sutherland,* 631 A.2d 354, 361 (D.C.1993). To make out a prima facie case of retaliation, the plaintiff must establish: (1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two. *See Young, supra,* 631 A.2d at 368; *Goos, supra* note 4, 715 F.Supp. at 3; *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2nd Cir.1988). Because Green failed to establish the first element of her prima facie case, her entire claim fails; therefore, we need not discuss the other two elements.

▇▇▇ With respect to the first element we note that, while under the DCHRA it is unlawful "to deprive any individual of equal employment opportunities because of his or her sexual orientation," *Newman v. District of Columbia,* 518 A.2d 698, 700 (D.C.1986), employment practices such as cronyism and

---

**3.** *See, e.g., Goos v. National Ass'n of Realtors,* 715 F.Supp. 2, 3 (D.D.C.1989) ("[t]he Title VII prima facie case analysis established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), has been held to apply to such suits under the District's Human Rights Act, as the Act was modeled on Title VII.")

Section 703(a) of the Civil Rights Act of 1964 (Title VII) states:

(a) **Employer practices**
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
42 U.S.C. § 2000e–2(a)(1) (1989).
Section 704(a) of the Civil Rights Act of 1964 (Title VII) states:

(a) **Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings**
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1989).

**4.** D.C.Code § 1–2512(a) and (a)(1) (1993) state:

(a) *General*—It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation of any individual:
(1) To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.
D.C.Code § 1–2525(a) and (b) (1993) state:
(a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise of enjoyment of any right granted or protected under this chapter.
(b) It shall be an unlawful discriminatory practice for any person to require, request, or suggest that a person retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by this chapter, or because that person has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing authorized under this chapter.

favoritism are not actionable under anti-discrimination statutes such as the DCHRA.[5] However, while proof of mere favoritism is insufficient to establish a claim of discrimination under the DCHRA, to make out a claim for retaliation, the plaintiff need only prove she had a reasonable good faith belief that the practice she opposed was unlawful under the DCHRA, not that it actually violated the Act. *See Manoharan, supra,* 842 F.2d at 593; *Love v. RE/MAX of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984) ("[e]very circuit that has considered the issue ... has concluded that opposition activity is protected when it is based on a mistaken good faith belief that Title VII has been violated.") (citations omitted).

Although in a retaliation action a plaintiff is not required to prove that the activity which she opposed constituted an actual violation of the Act, she nonetheless must voice her complaint about, or oppose, the allegedly unlawful activity in order to prevail on her claim.[6] Integral to this opposition requirement is that the plaintiff must alert the employer that she is lodging a complaint about allegedly discriminatory conduct.[7] Employer awareness that the employee is engaged in protected activity is thus essential to making out a prima facie case for retaliation. *Cf. Manoharan, supra,* 842 F.2d at 593 (court's rendition of prima facie case for retaliation under analogous Title VII explicitly states a requisite fourth element "that the employer was aware of that [pro-

tected] activity"). Therefore, to establish a prima facie case of retaliation, Green must show she opposed or complained of activity which she reasonably, in good faith, believed was based on sexual orientation discrimination, and that she so informed the employer. *See Manoharan, supra,* 842 F.2d at 593.

While Green complained on many occasions about the alleged favoritism the Director showed for these two women, she repeatedly admitted during her testimony that she never complained to anyone at Howard University about the existence of sexual orientation discrimination until she filed her lawsuit in District Court.[8] Indeed, the trial court explicitly found, "[Green] never was direct in her complaints [regarding alleged homosexuality] nor did she expressly tell ... [the Director] or any higher Howard University management official that ... [the Director] was engaging in sexual orientation discrimination, and that the employment practices she questioned was [sic] the result of such discrimination." Further, Green testified that, despite her twenty-year tenure at the Hospital and her familiarity with Howard Employee Handbooks and discrimination complaint procedures, she never indicated to anyone before the RIF that she believed the other Associate Director and Coordinator were homosexual, or that she felt she was being treated less favorably because of the Director's alleged relationships with these women. Additionally, unbeknownst to the Director, Green met with the Chief Execu-

---

5. *See, e.g., Benzies v. Illinois Dep't of Mental Health and Developmental Disabilities,* 810 F.2d 146, 148 (7th Cir.1987), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987) (finding employer actions based on "personal or political favoritism, a grudge, random conduct, [or] an error in the administration of neutral rules" are not cognizable under Title VII, for it is "not a civil service statute" designed to remedy all ill-reasoned employer decisions) (citation omitted); *Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1026–27 (1st Cir.1988) (finding evidence of apparent favoritism insufficient to establish race or sex discrimination under Title VII where plaintiff did not offer "a scintilla of evidence which tended to show that her color or her sex— as opposed; say, to some informal preferment of veterans or garden-variety cronyism" was basis for employment decision).

6. *See* D.C.Code § 1–2525(b) (1992) ("[i]t shall be an unlawful discriminatory practice for any per-

son to ... retaliate against ... a person, because that person has opposed any practice made unlawful by this chapter....").

7. *See Goos, supra,* note 4, 715 F.Supp. at 3–4 (applying Title VII analysis to DCHRA court found plaintiff had sufficiently "voic[ed] her opposition" to terminating an employee by telling superior the termination was "unethical" and "racially motivated"); *Jones v. Lyng,* 669 F.Supp. 1108, 1121 (D.D.C.1986) ("a prima facie case of retaliatory motive is proved by showing that plaintiff engaged in protected activities, that *his employer was aware of the protected activities,* and that adverse action followed within a relatively short time thereafter.") (emphasis added) (citation omitted).

8. *See supra* note 2.

tive Officer of the Hospital in June 1989 and with the Interim President of the University in February 1990. During these meetings Green only complained of social cliques and favoritism stemming from personal friendships, and did not allude to favoritism based on homosexual relationships. Moreover, in a letter sent to the new Howard University president in May 1990, expressing concern about the upcoming reorganization in Nursing, Green made no mention of unlawful discrimination or favoritism based on homosexual preference.

 The evidence thus clearly shows Green failed to lodge an explicit complaint of sexual orientation discrimination. Nonetheless, the trial court was correct in observing that "the communication of a complaint of unlawful discrimination, in a given set of factual circumstances, may be *inferred* or *implied* ... [absent] the use [of] the magic words 'sex discrimination' or 'sexual orientation discrimination.'" (emphasis in original). *See, e.g., E.E.O.C. v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012–13 (9th Cir.1983) (letter which did not "fit the classic mold of protected opposition to an unlawful employment practice [because it] did not protest ... specific ... instances of unlawful discrimination," was nonetheless found to fall within scope of statutorily protected opposition, because the letter stated that black employees had been fighting "racism and discrimination" at the company for years). However, the trial court erred in ruling that the surrounding circumstances, added to Green's otherwise innocuous complaints, create a sufficient basis for an impartial jury to find by a preponderance of the evidence that Green actually undertook protected activity. We now set forth our reasons for rejecting the trial court's ruling on this point.

### B.

 In addition to its consideration of the alleged pervasiveness of rumors of homosexuality and a litany of homosexual stereotypes, the trial court relied heavily upon the taped conversation between Green and the Director as a basis for its finding that the

Director was made aware that Green was actually complaining of sexual orientation discrimination. Green taped the conversation, without the Director's knowledge, while the Director was questioning her about rumors that she had used hospital staff to type her doctoral dissertation. In denying this rumor, Green stated she was tired of rumors about "[the Director] this, [the Coordinator] that." [9] Based on this vague and ambiguous conversation, the trial court found "it was obvious that [Green] was referring to the rumors concerning the two women having an [sic] homosexual relationship." Even drawing all reasonable inferences in favor of Green, as we must, no impartial jury could reasonably find that this conversation established that Green was voicing her opposition to discrimination based on sexual orientation.

The Director testified that Green never discussed the Director's sexual orientation with her; the first time she became aware that Green believed she was homosexual was when Green filed her lawsuit in District Court. The Director also related that Green never complained to her about a homosexual relationship with the Associate Director or the Coordinator, and she was never made aware of any complaints about her having homosexual relationships with these women being made to any Hospital official. Finally, she testified that prior to the District Court lawsuit she was not aware that her alleged homosexuality had ever been the subject of an inquiry or discussion by any Hospital official. There was no evidence, other than the taped conversation relied upon by the trial judge, which could rationally be viewed as contradicting the Director's testimony on this point. As we observed above, that conversation was too vague and ambiguous to provide the necessary link between Green's complaint and conduct which violates the DCHRA.

 Nor do the cases cited by appellee, in which less than explicit complaints were held to qualify as protected opposition activity under civil rights laws, provide support for the trial court's conclusion. Those cases can all be distinguished because the complainants actually conveyed a complaint of sex discrim-

9. The record does not reveal what response, if any, the Director made to Green's remark.

ination or another protected activity.[10] Thus, as the cases illustrate, while an employer's awareness may be inferred in a given set of factual circumstances, the employee must sufficiently alert the employer to the nature of her complaint. In short, the onus is on the employee to clearly voice her opposition to receive the protections provided by the Act. *See, e.g., Crown Zellerbach, supra,* 720 F.2d 1008, 1013 (9th Cir.1983) ("a simple assertion that an employer is personally bigoted, without more, is not statutorily protected opposition to an unlawful employment practice.").

## C.

■ In sum, we find nothing in the record to suggest the Director was alerted that Green was actually complaining of sexual orientation discrimination. The trial court's reliance on the taped conversation simply requires too many levels of inference to establish Howard University's awareness of a discrimination complaint. The trial court's implication that the atmosphere of prevalent stereotypes and allegedly rampant rumors of homosexuality somehow established "notice and knowledge on the part of ... [the Director] as to the nature and substance of the rumors" and thus proved the Director "knew exactly what Dr. Green was complaining about in [her] protests" does not create the requisite managerial awareness to make out a prima facie claim for retaliation. *See, e.g., Young, supra,* 631 A.2d at 368 (causal connection between adverse employment action and discrimination complaint must be predicated upon employer's knowledge that employee is engaged in protected activity); *Jones, supra,* 669 F.Supp. 1108 (same). In order to make out a prima facie case of retaliation it is not sufficient, notwithstanding

Green's suggestion to the contrary, to assert that, based on the work environment, management should have known a complaint of unlawful discrimination was being made. To establish the crux of a retaliation claim, i.e., a causal connection between an adverse personnel action and protected opposition activity, the employee must first prove she sufficiently alerted management to the nature of her complaint. *See, e.g., Young, supra,* 631 A.2d at 368; *Jones, supra,* 669 F.Supp. at 1121; *Manoharan, supra,* 842 F.2d at 593. It simply defies logic to charge an employer with acting in retaliation for an action of which the employer was not, in fact, made aware. Consequently, the alleged milieu of homosexual innuendo and out-moded stereotypes which the trial court found so probative and persuasive does not elevate Green's work-related complaints to the level of protected opposition activity under the DCHRA.

■ Retaliation provisions such as the one in the DCHRA are designed to protect those who speak out against unlawful discriminatory activity. To extend protection to potential plaintiffs like Green, who have done no more than complain about workplace favoritism, would expand the boundaries of the statute beyond what was intended. At oral argument Green's counsel admitted that Green had not been more explicit in her complaints because of her fear of retaliation. However, Green cannot have it both ways; she cannot withhold a discrimination complaint to avoid retaliation and then complain of retaliation based on a complaint which omits the charge. Because of that reality, we endorse the view expressed by the Court in *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312–13 (6th Cir.1989) in

---

10. *See, e.g., Love, supra,* 738 F.2d at 384 (court held plaintiff complained of sex discrimination by sending a memo to the president requesting a raise and attaching a copy of the Equal Pay Act); *Mahoney v. Driscoll,* 727 F.Supp. 50, 51–52 (D.Mass.1989) (court found that although "the two letters [of complaint] did not reference sex discrimination, taken in conjunction with plaintiff's discussions with her co-workers and defendant" in which she mentioned the possibility that she "was being discriminated against on the basis of sex" had sufficiently raised the issue of sex discrimination); *Zowayyed v. Lowen Co.,* 735

F.Supp. 1497, 1499, 1505 (D.Kan.1990) (court accepted plaintiff's "attempted" complaints of sexual harassment as sufficiently establishing protected activity where the plaintiff told her supervisor that an employee wrote to her " '[y]ou have playful eyes. Do you play?' " and had also "brushed up against her"); *Crown Zellerbach, supra,* 720 F.2d at 1012–13 (court found letter, which stated black employees had been fighting racism and discrimination for years, was protected activity in spite of fact that specific instances of discrimination were not mentioned).

analyzing a retaliation complaint under Title VII and Michigan's Civil Rights Act:

> The purpose of the statute is to protect access to the machinery available to seek redress for civil rights violations.... An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a [vague] charge of discrimination [in an internal letter or memorandum]. In our view, such would constitute an intolerable intrusion into the workplace.

*Id.* at 1313. To foster the underlying goal of human rights statutes—an end to discrimination—the burden is squarely on the employee to adequately voice her opposition so that management is made aware of the alleged discrimination, and so that it can take appropriate steps to eliminate the offensive conduct. If the employer, once aware of the discrimination, chooses to retaliate against the employee for opposing the conduct, the employee can then seek redress under the DCHRA.

### III.

In conclusion, we hold, viewing the evidence, as we must, in the light most favorable to Green, *Mike Palm, Inc. v. Interdonato*, 547 A.2d 1016, 1019 (D.C.1988), that Green failed to establish the first element of her prima facie case and thus presented insufficient evidence for a jury to reasonably conclude she made management aware of her belief in the existence of sexual orientation discrimination. We therefore reverse the trial court's denial of Howard's JNOV, and consequently, need not reach the merits of Howard's other claims.[11]

*Reversed.*

---

11. We are constrained to note, however, that the admission into evidence of rumors regarding the sexual orientation of the Director, the Associate Director, and the Coordinator had unfortunate consequences which the trial judge doubtless did not intend, but which were at odds with the purposes of the Human Rights Act. Some of these rumors, even if true, were not at all indicative of homosexuality; others intruded in an offensive manner on the women's privacy and held them up to ridicule. The repetition of such material in the courtroom and subsequently in the court's decision must have been extremely unpleasant for the subjects of the gossip, for their families and friends, and for sensitive people generally.

The Human Rights Act was primarily designed to protect from invidious discrimination those persons or groups who have traditionally been subjected to unfair treatment. Although heterosexuals are and should be covered too, the main purpose of the sexual orientation provision was to ensure that homosexuals enjoy equal rights previously denied to them. The record in the present case reveals, however, that the three women were in effect "accused" of being lesbians and that the material was presented in a manner which potentially catered to actual or perceived prejudice against homosexuals among members of the jury and the public at large. Courts should be cautious before receiving such evidence into the record. The judge was evidently of the opinion that, in this case, the admission of rumors and gossip was necessary to place Green's otherwise obviously insufficient complaint in context. It would have been preferable, however, not to disclose in a published opinion the names of the women who were the subjects of the innuendo.