Constance L. MILLSTEIN, Appellant,

v.

Stephen J. HENSKE, Appellee.

Nos. 96–CV–1750, 97–CV–609.

District of Columbia Court of Appeals.

Argued Dec. 17, 1998.
Decided Jan. 28, 1999.

Alex T. Sliheet, North Potomac, MD, with whom Herbert Alan Dubin, Rockville, MD, was on the brief, for appellant.

Joseph S. Crociata, with whom Martha Ann Knutson, Washington, DC, was on the brief, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and KING, Senior Judge.

FARRELL, Associate Judge:

In this appeal from the grant of summary judgment to the defendant ("Henske"), the plaintiff ("Millstein") contends that triable issues of fact exist as to whether Henske (1) unlawfully retaliated against her because of a fellow employee's participation in filing a gender and race discrimination complaint with the employer, see D.C.Code § 1–2525(a) (1992); and (2) defamed her in a written performance evaluation. We reject Millstein's invocation of a third-party reprisal theory on the facts of this case; hold as to defamation that she has not overcome Henske's qualified "common interest" privilege; and therefore affirm.

## I.

### A. The Facts

In 1983 Millstein, a nurse practitioner, began working at the Georgetown University Law Center Student Health Services Clinic (the "Law Clinic"). Although she was the Law Clinic's sole clinician, her work was supervised by doctors. At the time and for some years thereafter, an apparent practice existed whereby doctors would pre-sign prescription forms to enable Millstein and other practitioners to fill out certain prescriptions for students. The practice continued at the Law Clinic during the period of 1988 to 1994 when Millstein was supervised by Dr. Jane Chretien. Chretien's relationship to Millstein, as the doctor stated in her deposition, was a "[p]rofessional one"; she had been "a colleague [of Millstein] for twelve ... or thirteen years."

In January 1993, nine student health employees[1] lodged a complaint with the Georgetown Office of Affirmative Action Programs alleging gender and race discrimination and unprofessional behavior on the part of defendant Henske, the Director of Student Health Services. Dr. Chretien, who was Acting Medical Director of Health Services at the time, wrote the complaint and was apparently the liaison between the employees and the university's affirmative action committee. Millstein, on the other hand, was not a complainant, was not interviewed in connection with the complaint, and by her admission had "zero to do with it." The complaint was resolved in March 1993 with a finding of no evidence of race or gender discrimination, but some evidence of differential treatment and unprofessional behavior.

Soon after the complaint was resolved, Dr. Chretien applied twice for the position of permanent Medical Director of Health Services. Each time, the committee to select the director dissolved itself, and in fact no director was selected because the Georgetown University Medical Center proposed to take over management of the Student Health Center. During a subsequent staff meeting which was to become important to this litigation,[2] Millstein publicly asked why Dr. Chretien had not received the medical director

---

1. Georgetown University maintained two student health centers, one at the Main Campus and a "satellite" office at the Law Center.

2. The record does not reveal exactly when the meeting took place. Henske says it occurred in September 1993; Millstein, while not disputing that date on appeal, asserted below that it occurred in the Spring of 1994.

position, pointing to her 22 years at Georgetown and her dedication to student health. In doing so, though, Millstein made no reference to the earlier discrimination complaint. While he was in the hospital sometime after this meeting, Henske asked Nurse Larkin, a fellow employee of Millstein, why "Connie [Millstein] is against me," presumably referring to her criticism at the meeting. In this conversation, neither Larkin nor Henske linked the criticism to the 1993 discrimination complaint. Dr. Chretien left Georgetown University in September 1994, and Henske became Millstein's direct supervisor.

At a meeting on September 7, 1994, Henske told Millstein that a law student had complained about the use of pre-signed prescriptions at the Law Clinic. Henske and Dr. Wills, a senior health physician who was also present, told her that the practice had ended at Main Campus and should be stopped immediately at the Law Clinic. Henske and Millstein met again on December 13, 1994, and Henske told her that she would not receive her performance review in December (as had previously been the case) because he felt the evaluation would be negative in light of the student complaint and Millstein's use of the pre-signed scripts. Millstein wrote a letter to Henske the next day, with copies to the university president and other officials, in which she protested (among other things) that she had not been informed of the change in the prescription practice—which had been in effect since 1983—until the September 7 meeting.[3] She followed this up with a December 15 letter to Dr. James Donahue, Dean of Student Affairs, asking rhetorically whether Henske's conduct toward her on December 13 had not reflected discrimination and retaliation. Henske, apparently informed of the letter, responded in late January 1995 with a memo to Millstein stating that "our time would be far better spent addressing the quality of your performance rather than being immersed in a dispute over the timing of your evaluation."

Accordingly, on February 1, 1995, Henske wrote an evaluation of Millstein in two parts.

The first was a form to be placed in her Human Resources file, in which he rated her performance "satisfactory" overall and gave her a 3.3% raise. The second was a memorandum not to become part of her file, but carbon-copied to Dean Donahue, two Deans of the law school, and the law school Registrar. In it Henske explained that, while Dr. Chretien had "felt that [Millstein] had (at least) satisfactorily met the performance requirements of [her] job," he could not give her her performance review at that time because he had not had enough time to evaluate her and, further, had become aware of "deficiencies [in her] ... performance" that precluded a satisfactory rating at the time. After listing several deficiencies, Henske described how Millstein's future supervision would be carried out, and concluded with these paragraphs:

You and I have also discussed the use of pre-signed prescription pads. As I have told you the use of pre-signed prescriptions is illegal and unprofessional. Since my employment at Georgetown University, there has never been an approved policy to make pre-signed prescriptions available to the practitioner. Dr. Wills assures me that such a policy or practice does not exist in the Main Clinic. In my opinion, anyone pre-signing or knowingly completing a blank pre-signed prescription form (especially for a controlled dangerous substance) also demonstrates faulty professional judgment. You have advised me that this practice ended in August, 1994. It may not be reinstated at any time in the future.

I will be conducting a follow-up to this evaluation in approximately 60 days. By that time, I expect significant progress to have been made on the issues I have outlined in this memo.

I look forward to the opportunity to work with you on these concerns.

### B. The Proceedings

In September 1995, Millstein sued Henske for (among other things) defamation and re-

---

**3.** The practice, as Millstein described it in her letter, had been "to have a few pre-signed prescriptions available to the practitioners so that on those rare occasions when they had to pre- scribe Tylenol # 3 for students with severe pain, the practitioners would be able to do so without having to bother the medical doctors for their signatures."

taliation, the latter count alleging reprisal for her support of Dr. Chretien's role in the discrimination complaint.[4] Initially it appeared that Millstein had abandoned the retaliation claim, and the trial court granted summary judgment for the defendant on all counts, noting that Millstein "apparently concedes the claim of retaliation." In a motion for reconsideration—essentially a motion under Super. Ct. Civ. R. 59(e)—Millstein disputed this conclusion, arguing that she had presented evidence of a retaliatory motive on Henske's part relevant both to the defamation claim (as proof of malice) and violation of the District of Columbia Human Rights Act;[5] i.e., Henske harbored a "carried state of retaliation in his mind stemming from Ms. Millstein's previous statements supporting Dr. Chretien." The retaliation allegedly took the form of the "defamatory" February 1, 1995, written evaluation and other adverse actions.

Apparently disagreeing with Henske's response that Millstein was seeking to resuscitate a retaliation claim she had previously abandoned, the trial court granted the motion to reconsider, but again entered summary judgment for Henske presumably on the ground that Millstein had not made out a prima facie case of retaliation.

## II. Discussion

### A. Retaliation under the Human Rights Act

■ Millstein contends that she indeed raised triable issues of fact concerning retaliation under the Human Rights Act ("DCHRA" or "the Act"). D.C.Code § 1–2525(a), the anti-retaliation provision of the Act, states:

> It shall be an unlawful discriminatory practice to ... retaliate against ... any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.[6]

A plaintiff makes out a prima facie case of retaliation by establishing that "(1) she was engaged in a protected activity, or that she opposed practices made unlawful by the DCHRA; (2) the employer took an adverse personnel action against her; and (3) a causal connection existed between the two." *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.1994).[7]

■ Millstein argues that she made out the first element of a prima facie case by presenting evidence of "third-party reprisal," i.e., that Henske retaliated against her for Dr. Chretien's part in filing the discrimination claim with the university. Millstein thus studiously avoids on appeal any argument that she herself engaged in an activity protected by the DCHRA, and this prompts Henske to object that she has abandoned her sole theory of reprisal below—which was that she herself, by publicly supporting Dr. Chretien, had engaged in and been punished for protected activity. Millstein rejoins that the

---

4. Millstein also sued Judith Areen, Dean of the Law Center for defamation and false light. Millstein has since voluntarily dismissed Dean Areen from this appeal.

5. She had not cited the Human Rights Act in her complaint.

6. One right thus protected is the right not to be discriminated against in employment based "wholly or partially" on "race, color, religion, ... [or] sex ...." D.C.Code § 1–2512(a).

7. As this appeal is from the grant of summary judgment, the familiar standards for review of such a disposition apply. This court "conducts an independent review of the record, but the substantive standard is the same as that utilized by the trial court ." *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 660 (D.C.1997) (citations and internal quotation marks omitted). In turn,

> [t]he test for deciding a motion for summary judgment is essentially the same as the standard for a directed verdict. In considering the motion, the judge must determine whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. If the summary judgment record demonstrates that, construing all of the facts and inferences to be drawn therefrom in favor of the party against whom the judgment is entered, he would not be entitled to have a jury verdict stand, ... the grant of summary judgment is proper.

*Id.* (internal citations and quotation marks omitted).

present theory was embraced by her general claim of retaliation (and defamatory malice) made to the trial court, and that on appeal she is not restricted to the precise arguments she made below on the issue, citing, *inter alia, Yee v. Escondido,* 503 U.S. 519, 534–35, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), and *Mills v. Cooter,* 647 A.2d 1118, 1123 n. 12 (D.C.1994). Millstein's argument is dubious: never did she mention to the trial court or cite authority supporting the theory of reprisal now urged to us, on which this court has not passed judgment before and on which we lack the benefit of the trial court's analysis. Nonetheless, we do not decide whether Millstein waived the claim of third-party reprisal, because we hold that she cannot prevail on it on the merits for two reasons.

### 1.

In urging the theory here, Millstein relies chiefly on the rationale stated for it in *De Medina v. Reinhardt,* 444 F.Supp. 573 (D.D.C.1978). There a woman alleged that the United States Information Agency had refused to hire her in reprisal for her husband's anti-discrimination activities within the agency. *Id.* at 574. Though she herself had not taken part in that activity, the District Court ruled that she had stated a valid claim under Title VII of the Civil Rights Act of 1964,[8] explaining:

> Congress did not expressly consider the possibility of third-party reprisals—*i.e.,* discrimination against one person because of a friend's or relative's protected activities .... [But] Congress unmistakably intended to ensure that no person would be deterred from exercising his rights under Title VII by the threat of discriminatory retaliation. Since tolerance of third-party reprisals would, no less than the tolerance of direct reprisals, deter persons from exercising their protected rights under Title VII, the Court must conclude ... that section 2000e–3 proscribes the alleged retaliation of which plaintiff complains.

*Id.* at 580.

Since *De Medina,* federal courts have divided on whether, in interpreting anti-repri-

sal provisions of Title VII or kindred legislation, one person's engaging in protected activity may "be imputed to" another. *Holt v. JTM Indus., Inc.,* 89 F.3d 1224, 1226 (5th Cir.1996) (characterizing plaintiffs' argument as claim that "Linda's charge of age discrimination, which is protected activity under the [Age Discrimination in Employment Act of 1967], should be imputed to her husband Frank"). The debate is largely over whether that imputation can be squared with the plain language of anti-reprisal provisions which seemingly require that a plaintiff has personally engaged in statutorily protected activity, *see, e.g .,* D.C.Code § 1–2525(a), quoted *supra;* or whether, instead, so literal a reading of the statute would permit the mischief the court in *De Medina* identified, and be inconsistent with the remedial purposes of civil rights statutes and a court's duty to interpret them generously, *see Simpson v. District of Columbia,* 597 A.2d 392, 398 (D.C.1991). *Compare, e.g., Holt,* 89 F.3d at 1226–27, and *Smith v. Riceland Foods, Inc.,* 151 F.3d 813 (8th Cir. 1998), *with Holt,* 89 F.3d at 1228–34 (Dennis, J., dissenting); *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 543–44 (6th Cir.1993); *Craig v. Suburban Cablevision, Inc.,* 274 N.J.Super. 303, 644 A.2d 112, 115–17 (N.J.Super.Ct.App.Div.1994), *aff'd,* 140 N.J. 623, 660 A.2d 505, 507–09 (N.J.Sup.Ct.1995) (applying N.J. Law Against Discrimination).

This case, as it turns out, does not require us to decide whether a properly limited version of the third-party reprisal theory is in keeping with our statute, because Millstein's claim represents an unprecedented expansion of the definition of "third-party." To our knowledge (based on Millstein's cited cases and our own research), no court accepting the extended reprisal doctrine has applied it to the bare relationship of co-employees. Millstein, of course, was not related to Dr. Chretien, nor were they personal friends; their relationship, as Dr. Chretien testified (and Millstein acknowledges), was a "[p]rofessional one. [Millstein] was a col-

---

8. This court "look[s] for guidance to our cases addressing retaliation under the DCHRA and to retaliation case law under federal employment

discrimination legislation analogous to the DCHRA ("Title VII")." *Howard Univ. v. Green,* 652 A.2d at 45.

league for twelve ... or thirteen years." Even Millstein's statement to Henske that Dr. Chretien should have been given the job of medical director was based solely on her professional assessment of Dr. Chretien.[9] By contrast, nearly every case relied on by Millstein concerned a relationship between spouses, siblings, or at most, close friends.[10] Even the decision in *Craig, supra,* on which Millstein relies most heavily, involved four plaintiffs two of whom were relatives (mother and sister) and two who were "close friends." *Craig,* 660 A.2d at 506.[11] In *EEOC v. Ohio Edison Co., supra,* also cited by Millstein, the protected activity which the co-worker engaged in was a protest of the complainant's own discharge (resulting in alleged retaliatory rescission by the employer of a reinstatement offer previously made to the complainant); the co-worker was the complainant's "representative"—in effect his alter ego. 7 F.3d at 546.

We decline Millstein's invitation to adopt a third-party reprisal theory embracing so attenuated a relationship as was hers to Dr. Chretien. A contrary rule would make the prospect of a retaliation claim haunt any adverse action following a discrimination complaint by a fellow employee. *See id.* (voicing concern that "any time that an adverse employment action is taken by an employer against an employee at the same time a second employee is engaging in protected activity, the first employee could allege retaliation"). Nor does this leave employees such as Millstein without remedy for retaliation, as she contends. In many such cases the employee's own actions supporting another's claim of discrimination will be protected activity. *See* D.C.Code § 1–2525(a) (condemning retaliation for "having aided or encouraged any other person" in exercising protected right). Indeed, that was Millstein's theory of discrimination argued below, but now abandoned.

2.

Alternatively, even if we adopt *arguendo*—for purposes of this case—a reprisal theory imputing the protected activity of one employee to another, we nonetheless hold that Millstein has failed to make out a prima facie case of retaliation. That is because she failed to present, through deposition testimony or otherwise, evidence of a causal connection between the supposed adverse actions against her (including a defamatory evaluation) and Dr. Chretien's discrimination complaint. *See Howard Univ. v. Green,* 652 A.2d at 48 (the "crux of a retaliation claim" is "a causal connection between an adverse personnel action and protected opposition activity").[12]

The link which Millstein alleges is the Spring 1994 staff meeting (see note 2, *supra* ) at which she questioned why Dr. Chretien had not received the medical director position. In a sense, although Millstein does not characterize it this way, she is alleging that she herself engaged in protected activity by publicly supporting Dr. Chretien's earlier action.[13] The flaw in this supposed connection, though, is factual: Millstein did not mention the discrimination complaint in questioning the promotion decision, nor does she contend

9. As Millstein stated: Dr. Chretien "was a brilliant woman, had been there 22 years and had dedicated her life to student health."

10. *See De Medina,* 444 F.Supp. at 580 (husband/wife); *Mandia v. ARCO Chem. Co.,* 618 F.Supp. 1248, 1250 (W.D.Pa.1985) (husband/wife; generally discusses "close relatives"); *Clark v. R.J. Reynolds Tobacco Co.,* 27 Fair Empl. Prac. Cas. (BNA) 1628, 1982 WL 2277 (E.D.La. 1982) (father/son); *Marshall v. Georgia Southwestern College,* 489 F.Supp. 1322, 1331 (M.D.Ga.1980) (husband/wife); *Marinhagen v. Boster, Inc.,* 17 Kan.App.2d 532, 840 P.2d 534, 541 (Kan.App.1992) (husband/wife). Other cases are to the same effect; *Murphy v. Cadillac Rubber & Plastics, Inc.,* 946 F.Supp. 1108, 1117–18 (W.D.N.Y.1996) (husband/wife); *McKenzie v. At-* *lantic Richfield Co.,* 906 F.Supp. 572, 575 (D.Colo.1995) (husband/wife); *Thurman v. Robertshaw Control Co.,* 869 F.Supp. 934, 941–42 (N.D.Ga.1994) (husband/wife could bring claim but failed to show prima facie case).

11. Moreover, the department in which they all worked was "small and cohesive," and the plaintiffs "constituted virtually the entire sales force." *Craig,* 660 A.2d at 508.

12. We assume for argument's sake that a negative performance evaluation by itself could constitute an adverse personnel action.

13. That, as pointed out above, was her position in the trial court.

that she had personally voiced discrimination concerns at any time or allied herself with Dr. Chretien's complaint. Further, the complaint itself was not a fresh topic at the university, since it had been resolved (by Millstein's account) more than a year before she spoke up at the meeting. Thus, she presented no evidence beyond surmise that Henske would have perceived a connection between her implied criticism of the promotion decision and Dr. Chretien's earlier complaint. Henske's statement to Nurse Larkin soon afterward that Millstein "is against me" does not fill the gap because, while it referred to her criticism at the meeting, it too did not associate that with the discrimination complaint.[14]

■ An employee must have alerted the employer to the discrimination-based nature of her opposition before an inference may be drawn that she was retaliated against for exercising that right. See Howard Univ. v. Green, 652 A.2d at 48 ("[T]he onus is on the employee to clearly voice her opposition to receive the protections provided by the Act"; general complaints about "workplace favoritism" or other conduct not actionable under the DCHRA do not put the employer on the required notice); Gold v. Gallaudet College, 630 F.Supp. 1176, 1187 (D.D.C.1986) (airing "generic" dissatisfaction with promotion decision "cannot be deemed statutorily protected activity, for then every questioning of a promotion would constitute an invocation of Title VII protections"). Neither Millstein's criticism nor Henske's reaction to it supports an inference that Henske retaliated against Millstein because Dr. Chretien or Millstein herself had engaged in protected activity.

### B. Defamation.

■ Millstein's claim of defamation focuses on Henske's February 1, 1995, written evaluation of her performance, in particular the second part, which was not to become part of her personnel file but copies of which were sent to three Deans and the law school Registrar. Specifically, Millstein points to one of the final paragraphs dealing with the practice of using pre-signed prescription pads at the Law Clinic, see p. 852, supra, and argues that this constituted "defamation by implication": it implied that (a) she had instituted the practice, which was (in the evaluation's words) "illegal and unprofessional," and (b) she was the only one who continued to follow it.

■ Millstein concedes that the statements, as part of her work performance appraisal, are subject to a qualified "common interest" privilege.

To come within the protection of the "common interest" privilege, the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.

Moss v. Stockard, 580 A.2d 1011, 1024 (D.C. 1990) (citations omitted). The privilege is an important one, because "[i]f [its] protection were not given, true information that should be given or received would not be communicated because of fear of the persons capable of giving it that they would be held liable in an action of defamation if their statements were untrue." RESTATEMENT (SECOND) OF TORTS, Ch. 25, Topic 3, Tit. A Scope Note (1977).

■ Millstein does not invoke the second and third criteria here, but argues that a jury question exists as to whether Henske acted maliciously (in bad faith) and so lost the benefit of the privilege. In this context, malice means

the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or

---

14. Dr. Chretien herself apparently saw no retaliatory link between her failure to get the promotion and her prior action, stating in her deposition:

    Q. Do you have any dispute or feelings about Georgetown in connection with their failure to hire you as medical director?

    A. No.

    Q. Do you have any understanding regarding what Mr. Henske's role was in the decision not to hire you as medical director?

    A. No.

effects upon the rights or feelings of others as to constitute ill will.

*Columbia First Bank v. Ferguson,* 665 A.2d 650, 656 (D.C.1995) (citations and quotation marks omitted). Besides contending that Henske harbored a "state of retaliation in his mind stemming from Ms. Millstein's previous statements supporting Dr. Chretien"—a thesis our conclusion in part H.A. largely rejects—Millstein argues that the text of the evaluation contained a reckless implication that she alone had instituted the pre-signed prescription practice and continued to follow it.

■ This argument rests upon a strained reading of the language in question. At most, reasonable minds can differ as to whether Henske's words implied that Millstein alone had instituted and was perpetuating the practice. But

[i]f "the language of the communication, and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant."

*Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 291 (D.C.1977) (citation omitted). First, while the evaluation states that "there has never been an *approved policy* to make pre-signed prescriptions available to the practitioner" (emphasis added), it does not appear to dispute that the *practice* existed until 1994 ("Dr. Wills assures me that such a ... practice *does not* exist in the Main Clinic" (emphasis added)) and, more importantly, says nothing about

who originated it. Second, it appears to take at face value Millstein's assertion that, however the practice had begun, it "ended in August, 1994." [15] While it goes on to say that "[i]t may not be reinstated," this need not imply that Millstein was still following it or even desired to, but at most—or at least permissibly—that she and Henske had disagreed in past discussions about the unlawfulness or unprofessionalism of a past practice she saw limited to prescribing Tylenol # 3 for students with severe pain. See note 3, *supra.* As the Director of Student Health Services, Henske had an obvious and legitimate interest in making clear that under no circumstances could the practice be resumed. And third, Millstein offered no evidence that any of the recipients of the evaluation, carefully limited to university officials with a need to know, had understood it to single out Millstein as responsible for either initiating the practice or continuing it, whether alone or with others.

In sum, Millstein raised no triable issue of fact as to whether "the statement [was] published ... with reckless or callous disregard for its effect upon the reputation of the plaintiff." *Moss,* 580 A.2d at 1025. Summary judgment was therefore correctly granted on the defamation count as well.

*Affirmed.*

---

15. The fact that the prescription practice is mentioned at all in the evaluation is understandable since Millstein, in a written letter to Henske copied to various Deans, had voiced disagreement with Henske's apparent understanding of the practice—*i.e.,* when it stopped, how widespread it had been—which he had communicated to her.