Charles BECKWITH, et al., Plaintiffs,

v.

**CAREER BLAZERS LEARNING CENTER OF WASHINGTON, D.C., Inc., Defendants.**

Civil Action No. 95–02037(PJA).

United States District Court, District of Columbia.

Nov. 27, 1996.

Gary Howard Simpson, Bethesda, MD, for plaintiffs.

Thomas C. Greble, New York City, for defendants.

## MEMORANDUM OPINION

ATTRIDGE, United States Magistrate Judge.

The plaintiffs, Charles Beckwith, Cordelia Attwell and Ervin Hodges, all former employees of the defendant, Career Blazers Learning Center of Washington, D.C. [Learning Center], seek equitable relief as well as compensatory and punitive damages alleging they were discriminated and retaliated against by the Learning Center and its Director, John Rogers.

Messrs. Beckwith and Hodges allege claims of racial discrimination, while Ms. Attwell alleges, in separate counts, claims of racial and sexual discrimination. Their claims are brought pursuant to the District of Columbia Human Rights Act [DCHRA], D.C. CODE § 1–2501, *et seq.* (1981) and 42 U.S.C. § 1981.

Pursuant to 28 U.S.C. § 636(c), the parties have consented to proceed before a U.S. Magistrate Judge for all purposes, including the entry of final judgment.

### Background

The Learning Center operates a proprietary business school in the District of Columbia. At all pertinent times, Mr. Rogers served as the Center's Director, and Mr. Jeffrey Oxman as its President. Mr. Beckwith and Ms. Attwell began their employment with the Learning Center as admission representatives on September 5, 1995. Mr. Hodges commenced his employment with the Learning Center on April 19, 1995.[1] Each was supervised by Mr. Rogers.

---

1. Mr. Hodges contends he answered an advertisement for the position of admissions director.

Mr. Beckwith resigned his employment on November 20, 1995; Ms. Attwell resigned her employment on November 30, 1995; and Mr. Hodges resigned his employment on August 31, 1995.

### The Respective Claims
#### Charles Beckwith

In his second amended complaint, Mr. Beckwith claims that, on October 12, 1995, Mr. Rogers told him that he was being promoted from the position of admissions representative to that of Director of Admissions with a $3000 a year salary increase (Pls' 2d amend. compl., ¶ 14); that on October 13, he was told a liberal leave policy was in effect for October 16, the day of the Million Man March in Washington, D.C. (Id. ¶¶ 16–18); and, on the afternoon of October 16, he telephoned his office to advise that he was taking the day off (Id. ¶ 17). He further claims on his return to work on October 17, after informing Mr. Rogers that he participated in the Million Man March, he was told that "he had lost his promotion, raise and job title" (Id. ¶ 21); moreover, he claims he was placed "under surveillance; wrongfully accus[ed] ... of taking company property from its premises"; denied the opportunity of wearing "sweats" to the office as he had done previously; and "threatened with discipline" (Id. ¶ 23). He attributes these actions to Rogers' hostility toward him because of his race and because of his advocacy of black rights. (Id. ¶ 22).

In Count I of his second amended complaint, Mr. Beckwith alleges he was retaliated against in violation of the DCHRA, [D.C. CODE § 1–2501, et seq. (1981) ] for encouraging others to exercise their civil rights and because of his participation the Million Man March.

Mr. Beckwith also contends he suffered retaliation for having filed this law suit [Count II]; and claims that he was discriminated against in the terms and conditions of his employment because of his race in that blacks and whites were work-force segregated and treated dissimilarly resulting in a higher turnover of black employees compared to white employees [Count III].

Lastly, Mr. Beckwith charges that he was subject to unspecified retaliation in violation of 42 U.S.C. §§ 1981 and 1981(a) [Count IV].

#### Cordelia Attwell

Ms. Attwell alleges in her second amended complaint that the defendants retaliated against her by depriving her of the opportunity to audition for a promotion to Director of Student Services [DSS] because she had complained that she was sexually harassed by Mr. Rogers. (Id. ¶ 30). She further complains she was retaliated against when wrongfully accused of taking company property (Id. ¶ 34), by being placed under surveillance, and by being threatened with disciplinary action (Id. ¶ 34). Ms. Attwell also contends she was passed over for a promotion in favor of a white female because of her race. (Id. ¶ 32).

In her multi-count complaint, Ms. Attwell charges the defendants with sexual harassment in violation of § 1–2512 of DCHRA [Count V]; discrimination in denying her a promotion because of her race in violation of the DCHRA [Count VI] and 42 U.S.C. § 1981 [Count VII]; and, lastly, retaliation, adverse treatment and denial of an employment promotion because of her race in violation of D.C. CODE § 1–2525 (1981) [Count VIII].

#### Ervin Hodges

Mr. Hodges asserts in the second amended complaint that he applied for the position of "director of admissions"; was promised a salary increase commensurate with that position "once he started enrolling people into the Career Blazers program" (Id. ¶ 39); never received training for any position as promised (Id. ¶ 41); was demoted without notice (Id. ¶ 42); denied the compensation he was promised (Id. ¶ 43); and, as a consequence,

When hired, he was not given a title, but his duties were those of an admissions representative. He described his title as "Admission Representative" on his company-provided application for health insurance and also on his employee information sheet. In his second amended complaint, he refers to himself as "Director of Admissions" whereas, in his deposition, he contends his job was that of "Director/Admissions Representative". His salary was that of an admissions representative.

was constructively discharged from employment (Id. ¶ 44). He attributes this adverse treatment to his race alleging that whites received promised promotions and were treated "more favorably than black employees with respect to the attitude and deportment of management at Career Blazers." (Id. ¶ 45).

Mr. Hodges charges he was discriminated against in the terms and conditions of his employment because of his race in violation of D.C. CODE § 1–2525 (1981) [Count IX].

All three plaintiffs further allege discriminatory treatment in terms of promotions and demotions because of their race in violation of D.C. CODE § 1–2512 (1981) [Count X].

### Defendants' Motion for Summary Judgment

The defendants moved for summary judgment on each and every claim. They argue that Mr. Beckwith's retaliation claims fail as a matter of law because he cannot establish a *prima facie* claim of unlawful retaliation for failure to promote [Counts I and IV] or for having filed this law suit [Count II and IV], and that his disparate treatment claim must fail for lack of record evidence [Count III].

The defendants argue that Ms. Attwell's claims fail as a matter of law because the evidence of record does not support a claim of sexual harassment [Count V], and that she cannot establish a *prima facie* case for discriminatory failure to promote [Counts VI and VII], nor for retaliation or adverse treatment because of her race [Count VIII].

Lastly, the defendants urge that Mr. Hodges claims of racial discrimination and constructive discharge fail for lack of record evidence [Count IX].

### Summary Judgment Standard

Summary judgment "should be granted only where there are no genuine issues of material fact, and all inferences must be viewed in a light most favorable to the nonmoving party." *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The mere existence, however, of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. The dispute must involve no genuine issue of material fact. *Liberty Lobby Inc.*, 477 U.S. at 247, 106 S.Ct. at 2509–10. "Material" facts are facts in dispute that "might affect the outcome of the suit under the governing law." *Id.*

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When evidence from the entire record could not lead a rational factfinder to find for the non-moving party, no genuine issue for trial exists and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### Analysis

### I. Beckwith

#### A) Retaliation Claims

Mr. Beckwith has charged the defendants under § 1–2525 of DCHRA with retaliation for having participated in the Million Man March in Washington D.C. on October 16, 1995 [Count I], and for having filed this lawsuit [Count II]. He also claims retaliation under 42 U.S.C. § 1981(a) for undescribed conduct [Count IV].

The elements of a retaliatory claim are the same under DCHRA as under the federal employment discrimination laws. *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C.App.1994). A *prima facie* case of retaliation requires a plaintiff to show: (1) that he was engaged in a statutorily protected activity or that he opposed practices made unlawful by the DCHRA; (2) that his employer took adverse personal action against him; and (3) that a casual connection existed between the two. *Howard*, 652 A.2d at 44; *Barnes v. Small*, 840 F.2d 972, 976 (D.C.Cir. 1988) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984)); *Evans v. Kansas City, Mo. School Dist.*, 65 F.3d 98, 100

**1042**

(8th Cir.1995) *cert. denied* —— U.S. ——, 116 S.Ct. 1319, 134 L.Ed.2d 472 (1996).

The defendants urge that Mr. Beckwith's attendance at the Million Man March [Count I] was not a "statutorily protected activity". They argue that he, therefore, is unable to satisfy the first element of a retaliation claim under either the DCHRA or § 1981. They contend that the term "statutorily protected activity" encompasses only "explicit complaints" about an alleged unlawful employment practice. "The March was not a protest of employment discrimination generally, much less to the employment discrimination on the part of the defendants in particular." (Defs' s.j. points & auth. at 21). The defendants argue that the March was " 'a holy day of atonement and reconciliation' for black men to pledge responsibility to themselves and their families and to promise to reject behavior that has led many to abandon their children, commit crimes and indulge in drugs." (Id. at 21) (quoting *The March on Washington: The Overview*, NY TIMES, Oct. 16, 1995, § B, at 6.).

In *Howard*, 652 A.2d at 46, the Court held that to successfully plead and prove a retaliatory claim under the DCHRA, a plaintiff must first show that he lodged a complaint with his employer about allegedly discriminating conduct. In other words, he must show that he "opposed or complained of activity which [he] . . . believed was . . . [racially] discriminat[ory], and that [he] so informed the employer." *Id.*

The defendants argue that the plaintiffs mere participation in the March, which they state was in no way related to any allegedly discriminatory employment practices by the defendants, is wholly insufficient to establish a claim of retaliation, i.e., later being the subject of adverse employment action in violation of DCHRA or § 1981. They contend that the record in this case demonstrates that Mr. Beckwith had no complaints of discriminatory conduct on the part of the defendants prior to his participating in the March. (Beckwith dep. at 503–504). It was only after he failed to report to work and failed to notify his employer until late in the afternoon of October 16, that he would not be coming to work on that day that he first was subject to the sanctions about which he complains.

The defendants urge that participation in the March—an unprotected activity, followed by adverse employment action is not sufficient to establish a retaliatory claim under § 1981. The defendants rely on *Evans*, 65 F.3d at 100–101, wherein the 8th Circuit Court of Appeals concluded that a teacher was not engaged in a "statutory protected activity" when he complained of the principal's plan for implementing a magnet program for a school which was more than 98% black. The court ruled that since the teacher's complaints were not related to his own terms and conditions of employment, his complaints were not remediable under Title VII or § 1981. *Id.*

■ The record is clear and unequivocal in this case that Mr. Beckwith's participation in the March was not related to the *terms and conditions of his employment*. The undisputed facts clearly establish that he was not engaged in a "statutorily protected activity". The March was not a protest against unlawful discriminatory employment conditions he was experiencing but rather a day of national atonement by black men. Mr. Beckwith failed to make out a *prima facie* case of retaliation for participating in the March under either the DCHRA or § 1981. Accordingly, the defendants' motion for summary judgment on Count I will be granted.

Next, Mr. Beckwith complains that following the filing of this lawsuit on November 1, 1995, he was subject to harassment by the defendants for having filed this action. In other words, he contends that he was subject to retaliation as a consequence of having filed this lawsuit alleging that he lost a promotion, lost income and lost a job title because he participated in the Million Man March. (Pls' 2d amend. compl. at ¶ 54).

■ The filing of the complaint, regardless of its merits, is a "statutorily protected activity" under both the DCHRA and § 1981. *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1425 (D.C.Cir. 1988). Mr. Beckwith, therefore, has satisfied the first element of a retaliation claim.

Mr. Beckwith alleges several acts of retaliation: First, on November 2, 1995, Beckwith was asked to surrender for inspection the property he was carrying as he exited the premises of the Learning Center. He says this never occurred prior to that date and that white employees were not subject to the same inspection. (Beckwith dep. at 527–528). Second, Mr. Beckwith says he received a memorandum from Mr. Oxman on November 14, 1995 (Pls' opp. to defs' mot. for s.j., ex. 1), which he claims accused him of theft and criticized him for wearing "sweats." He contends this never occurred before and, therefore, is evidence of unlawful surveillance by the defendants.[2]

■ The Court agrees that such evidence of adverse personnel action satisfies the second element of Mr. Beckwith's retaliatory claim. Moreover, since these actions occurred within two weeks of his having filed this lawsuit an inference arises that the retaliatory conduct complained of was proximately caused by the filing of the lawsuit,[3] thereby satisfying the last element of a retaliation claim. *See Schweiss v. Chrysler Motors Corp.*, 987 F.2d 548, 549 (8th Cir.1993) (citing *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1089 (8th Cir.1992) ("The evidence necessary to support the allegation of a causal connection for a *prima facie* case may be circumstantial, i.e., proof that the discharge followed the protected activity so closely in time as to justify an inference of retaliatory motive.") (internal quotations omitted)); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163–1164 (11th Cir.1993); *Garrett v. Lujan*, 799 F.Supp. 198, 202 (D.D.C.1992). Our inquiry does not end there, however, for once a *prima facie* case has been established thereby triggering a presumption of unlawful discrimination, the burden of production shifts to the employer to produce evidence "which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v.*

*Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). Nevertheless, the plaintiff retains the ultimate burden of persuasion; he "may prove 'pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *RAP, Inc. v. D.C. Comm'n on Human Rights*, 485 A.2d 173, 176–177 (D.C.1984) (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). Thus, if a defendant satisfies its burden of production, the plaintiff must then produce evidence that the reasons offered were not the true reasons for the adverse action but are a mere pretext for discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ In response to Mr. Beckwith's evidence of retaliatory treatment after the filing of his lawsuit, the defendants assert that neither Beckwith nor Attwell were authorized to be on the premises at the time of their after-hours stop while removing boxes from the Learning Center premises on the evening of November 2, 1995, one day after filing this lawsuit and hours after the defendants were served with suit papers. Defendants state that Mr. Beckwith had earlier left the premises at the conclusion of his work day only to return later that evening to retrieve and carry out boxes of documents. This conduct on the part of Beckwith and Attwell was certainly unusual and quite reasonably prompted an inquiry of them by Rogers to determine if they were removing Learning Center property.

The plaintiff characterizes this conduct and a reference to it in the memorandum of November 14, as having been accused of theft; neither of the defendants, however, accused Mr. Beckwith nor Ms. Attwell of theft. Given the setting and totality of the circumstance, a reasonable juror could only conclude that the defendants' conduct was motivated by legitimate concern for the rec-

---

**2.** The plaintiff also alleges that another employee saw Mr. Greble, defendants' lawyer, going through Mr. Beckwith's desk (Petry dep. at 121); this "search", however, took place after Beckwith's resignation from employment and therefore does not constitute a "retaliating search".

**3.** The complaint was served on the defendants shortly after 11:30 a.m. on November 2, 1995. (Return of Service of Summons, docket entries 3 and 4).

ords and documents of the Learning Center.[4] Moreover, they were permitted to exit the premises with the boxes even though they refused a request by Mr. Rogers to examine the contents of the boxes.

The effect of this evidentiary production by the defendants shifts the burden back to the plaintiff to produce evidence that the defendants' alleged reasons for stopping the plaintiffs and inquiring about the contents of the boxes were not their true reasons but were merely a pretext for retaliation. Mr. Beckwith has offered no proof in this regard.

Mr. Beckwith also complains that a November 14, memorandum from Mr. Oxman to him is further evidence of retaliation. That memorandum (Pls' opp., ex. 1) reprimanded Mr. Beckwith for his behavior on the evening of November 2, as well as for his behavior during the subsequent investigation of that incident, admonished him for wearing sweat clothes to the office, criticized his failure to keep his supervisor, Mr. Rogers, informed in advance of his intention to take leave or work at home, rebuked him regarding his attitude and insubordinate manner, and threatened him with termination if his conduct and attitude did not change.

■■■ Mr. Beckwith argues that this memorandum further evidences the retaliation he encountered. A fair reading, however, of the memorandum does not support Mr. Beckwith's allegations. The memorandum recites by chapter and verse recent alleged employment misconduct on the part of Mr. Beckwith. The plaintiff has not challenged the truth of any of the information contained in the memorandum. An employee is not immunized from criticism for wrongful conduct merely because he files a lawsuit. The fact that Mr. Beckwith filed his lawsuit did not allow him to remove property from his employer's premises after hours without challenge, nor did it license him to violate company dress codes and reporting requirements, or to act in an insubordinate manner. Although he alleges others were permitted to dress in sweats and that others failed to

report for work on time or at least failed to timely telephone to inform the Learning Center that they may be late for work, Mr. Beckwith offers no evidence in this regard. In the absence of evidence that others were treated differently or that the factual basis for the criticism was pre-textual or untrue, Mr. Beckwith has failed to satisfy his burden of production on his claim for retaliation.

■■■ Moreover, mere criticism and warnings concerning alleged misconduct do not, of themselves, constitute adverse changes in the terms and conditions of employment. *See Stoeckel v. Envtl. Management Sys., Inc.,* 882 F.Supp 1106, 1116 (D.D.C.1995). Accordingly, the defendants motion for summary judgment with respect to Count II will be granted.

### B) *Discrimination Claim*

In Count III of his amended complaint, Mr. Beckwith charges the defendants with maintaining a segregated workforce and causing a higher turnover of black employees when compared to white employees. This count does not identify the statutory provision relied upon.

■■■ While allegations of this kind may be relevant to show that a discriminatory reason more likely motivated the employment actions and decisions that were adverse to Mr. Beckwith, or that the proffered reasons for the disparate treatment that he alleges he received are unworthy of belief, a plaintiff is obligated, nevertheless, to produce evidence " 'includ[ing] facts as to ... (the defendant's) general policy and practice with respect to minori(ties)' ". *Miller v. Poretsky,* 595 F.2d 780, 791–792 (D.C.Cir.1978) (Robinson, J., concurring) (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804–805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973)). While testimony of discriminatory acts against others is relevant evidence (Id. at 793, 93 S.Ct. at 1820), such observations and experiences are required to be presented in the proper context. *See: Harris v. D.C.*

---

4. Although Ms. Attwell alleged that the box she carried contained personal papers, she later admitted during her deposition that the box contained Learning Center records including student

records, admission reports, appointment records, lead logs and financial information. (Vol. II, Attwell Dep. Transcript of January 23, 1996, at 410–421).

*Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989). Beckwith has presented no competent evidence in support of his generalized observations that the defendants segregated their work force or that they caused a substantially higher turnover of their black employees when compared to white employees. On the other hand, the defendants have produced evidence that their work force was integrated and that turnover rates of blacks and whites were comparable. The plaintiff has failed to come forward with factual evidence showing that the statistical evidence presented by the defendants in opposition to his charges of disparate treatment of blacks as a whole is inaccurate or lacks credibility. In the absence of such evidence, the plaintiff's generalized observations and opinions are insufficient to sustain his burden with respect to his charges of class segregation and disparate treatment.

 In the second part of Count III, Mr. Beckwith alleges that he personally was subject to racial discrimination when denied a promised promotion. The elements of this claim are the same under 42 U.S.C. § 1981 and under §§ 1–2511 and 2512 of the DCHRA, *Thompson v. IAM,* 614 F.Supp. 1002, 1011 (D.D.C.1985); and consist of the following:

> First, the employee must make a *prima facie* showing of discrimination by a preponderance of the evidence. Once that has been done, a rebuttable presumption arises that the employer's conduct amounted to unlawful discrimination. The burden then shifts to the employer to rebut this presumption by articulating some legitimate, nondiscriminatory reason for the employment action at issue. Finally, if the employer has articulated some legitimate, non-discriminatory reason for the disputed conduct, the burden shifts back to the employee to prove, again by a preponderance of the evidence, that the employer's stated justification for its action was not its true

reason but was in fact merely a pretext to disguise a discriminatory practice.

> A *prima facie* case of discrimination in the denial of a promotion normally consists of proof (1) that the plaintiff was a member of a protected class, (2) that he or she was qualified for the promotion, (3) that he or she was rejected upon seeking the promotion, and (4) that a substantial factor in that rejection was the plaintiff's membership in the protected class.

*Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993) (internal quotations, citations and footnote omitted).

Although there is evidence to support the first three elements of Mr. Beckwith's discrimination claim, there is no evidence satisfying the fourth element, i.e., that race was a *substantial* factor in his promotion rejection. Nevertheless, the defendants have come forward with a memorandum that shows the Learning Center's President directed that certain criteria be met before a promotion is made to a proposed new position. (Defs' mot. for s.j., ex. k).[5]

 The defendants argue that the evidence, and lack thereof, establishes that Mr. Beckwith's employment record did not meet the criteria for promotion or for the creation of a new supervisory position. They argue that at the time Mr. Beckwith's promotion was under consideration there was no identifiable equitable system for evaluating applicants in place by which Mr. Beckwith's abilities could be judged and which provided all applicants with an equal opportunity for promotion as required by the guidelines issued by Mr. Oxman. They further argue that it is clear that a level of mutual respect and teamwork did not exist. They point to the evidence that Mr. Beckwith failed to notify his employer that he planned to participate in the Million Man March; that, on October 19, he again failed to timely report for work, electing instead to do field work without

---

5. Memorandum of October 31, 1995, from Jeff Oxman to John Rogers directing that promotions be put on hold until (1) "a fair and equitable system" has been developed to provide all employees with "an equal opportunity for advancement"; (2) "a clear, identifiable business need" exists for the new or existing promotion and a "job description" and "defined measure of performance standard" has been created; (3) a "level of professional respect and teamwork" has been developed between the "supervisor and employee"; and (4) the promotion selectee has demonstrated an ability to meet and exceed the "present performance standards."

notifying his supervisor; and that when admonished about this conduct, Mr. Beckwith became angry, challenged his supervisor's judgment, and left the supervisor's presence while the issue was still under discussion. Further, when informed that promotions were being deferred, Mr. Beckwith became so angry with his supervisor that he requested leave time to regain his composure.

This evidence satisfied the defendants' burden of production. The defendants having produced "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus", *RAP, Inc.*, 485 A.2d at 178, the burden shifted to the plaintiff to show "that a discriminatory reason more likely motivated the employer, or ... show[ ] that the employer's proffered explanation is unworthy of credence." Id. at 177 (internal quotation and citations omitted)[6]. Mr. Beckwith concedes that he failed to notify Mr. Rogers that he intended to take the day off to participate in the Million Man March. He challenges the evidence that he was hostile, rude and insubordinate in a meeting with Oxman and Rogers on October 20, and again on October 27, and that he was insubordinate in a meeting with Oxman and Rogers on October 31. However, he does concede that he was angry and left Rogers presence while Rogers was discussing his conduct, and that Rogers had to seek him out; he also concedes that he became so upset at a meeting with Oxman that he took an hour's leave in order to compose himself. He further concedes that he and Ms. Attwell departed the Learning Center after normal business hours carrying boxes of unidentified materials. And he concedes that Rogers did no more than question him about the content of the boxes. He does not challenge the defendants' proffer that he refused to cooperate in a subsequent investigation regarding his removal of materials from the premises.

On this record, Mr. Beckwith proffers no evidence to show that his race more likely motivated the defendants' actions in reprimanding him or that their proffered reasons for the disparate treatment is unworthy of credence. There is no factual dispute regarding what took place. Mr. Beckwith merely contends that race must have been the motivating factor; but, in the absence of evidence that cast credibility on the reasons advanced by the defendants, he has failed to sustain his burden at the fourth step of his claim of racial discrimination.

Moreover, his claims of discriminatory treatment because he was admonished not to wear "sweats" and was "threatened with discipline" also fail. He does not contest that a dress code had been in effect. A request by an employer that an employee comply with a dress code is not an adverse employment action. *Murphy v. Yellow Freight Sys., Inc.*, 832 F.Supp. 1543, 1551 (N.D.Ga. 1993). Although he contends that others were permitted to wear sweats or that they were some how treated differently, he has come forward with no evidence of record that other employees were allowed to wear "sweats" in violation of the code or that he was treated differently from others in this regard. "Once the movant has discharged his duty, the onus shifts to the nonmovant ... to respond with specific facts ... [T]he clear language of Rule 56(e) ... itself mandates that the nonmovant set forth specific facts in its opposition ...". *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1033 (D.C.Cir. 1988). This, Mr. Beckwith failed to do.

He also failed to challenge the facts that underlie the threat of disciplinary action contained in Mr. Oxman's memorandum of November 14. Mr. Beckwith was not free to disregard the reasonable employment policies of his employer. The fact that he filed this suit on November 1, 1995, did not license him to disregard employment policies or to act in an angry and uncooperative manner. As an employee, he was obligated to cooper-

---

**6.** "The employer need not convince the decisionmaker that its proffered reason was the actual reason for the employment decision. The employer is not required to prove by a preponderance of the evidence the existence of the nondiscriminatory reason for the action. Rather, the defendant need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *RAP, Inc.*, 485 A.2d at 176 (internal quotations omitted).

ate in his employer's investigation of his after hours removal of boxes from the employer's premises. A reprimand or a warning under the undisputed facts of record does not rise to the level of discriminatory treatment. An employer is entitled to expect cooperation from its employees regarding business matters. *Batson v. Powell,* 912 F.Supp. 565, 578 (D.D.C.1996).

Since Mr. Beckwith has not produced evidence from which a finder of fact could conclude that the defendants did, in fact, maintain a segregated work force, or that the turnover rate of black employees was greater than that of white employees, or that the defendants' evidence offered in response to his claim of disparate treatment was pretextual or unworthy of credence, the defendants' motion for summary judgment on Count III will be granted.

## II. *Attwell*

### A) *Sexual Harassment*

■ "[A] plaintiff establishes a *prima facie* case of sexual harassment [under DCHRA] upon demonstrating that unwelcome verbal and/or physical advances of a sexual nature were directed at him/her in the workplace, resulting in a hostile or abusive working ... [T]he totality of the circumstances must be considered." *Howard Univ. v. Best,* 484 A.2d 958, 981 (D.C.1984) (citations omitted).

■ Discriminating sexual harassment may take on two forms: "the grant or denial of an economic quid pro quo in exchange for sexual favors" and the "creat[ion of] a hostile or abusive work environment." *Gary v. Long,* 59 F.3d 1391, 1395 (D.C.Cir.1995) (citations omitted). Ms. Attwell does not allege quid pro quo harassment. Her claim is limited solely to hostile work environment.

Ms. Attwell charges that she was subject to unwelcome *physical* advances of a sexual nature, citing four situations: (1) when Mr. Rogers' pinky brushed her knee while the two were reviewing a document; (2) when Mr. Rogers' knee pressed against her knee while reviewing documents; (3) when Mr. Rogers brushed her shoulder while pointing something out on a calendar; and (4) when Mr. Rogers stood so close to her while discussing a business matter that she could feel his breath on her neck.

She further charges that she was subject to unwelcome *verbal* advances of a sexual nature on four occasions: (1) when, in response to her inquiry as to whether her attire was in compliance with the company's dress code, Mr. Rogers said that, "in my opinion, you always dressed very professionally. In fact, you look beautiful"; (2) when Mr. Rogers said to her, "when you work with someone, its hard to have any other kind of relationship with them other than just professional"; (3) when Mr. Rogers suggested they go running together; and (4) when Mr. Rogers offered her a treadmill exercise machine provided she picked it up at his house.

■ In order to establish a claim for maintenance of a sexually hostile work environment under DCHRA, the evidence of sexual harassment "must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Best,* 484 A.2d at 979–980 (finding the unlawful employment practices section of DCHRA, D.C. Code § 1–2512(a)(1), substantially similar to that of Title VII, 42 U.S.C. § 2000e–2(a)(1)). "More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a *prima facie* case." Id. at 980.

■ The *physical* advances complained of by Ms. Attwell were isolated and trivial as a matter of law. These incidents complained of were not "so severe or pervasive that it create[d] a work environment abusive to [an] employee[ ] because of [her] ... gender ... thus offending Title VII's [and the DCHRA's] broad rule of work place equality." *Park v. Howard Univ.,* 71 F.3d 904, 906 (D.C.Cir.1995) (citations and internal quotes omitted). Accordingly, the defendants' motion for summary judgment on this claim will be granted.

■ Moreover, the *verbal* advances of an alleged sexual nature are to be viewed in "the totality of the circumstances," and when so considered, they too fail to establish a

*prima facie* case of sexual harassment. "No reasonable person would feel that an offensive or hostile work environment was created merely because a male supervisor or manager complemented a female employee on her appearance without more," *Norman v. Gannett Co., Inc.*, 852 F.Supp. 46, 49 (D.D.C. 1994), especially when the employee solicited his opinion on the business appropriateness of her attire. Nor could any reasonable person conclude that Mr. Rogers' statement to the effect that it is hard to have anything other than a professional relationship with an employee was a verbal advance of a sexual nature, especially viewed in its total context. The circumstances leading up to that remark as testified to by Ms. Attwell were as follows: Mr. Rogers stated to her that he heard that she was having some personal problems, offered to listen to her problem if she felt it would be helpful and, in that context, said, "I know that when you work with someone, it's hard to confide in them, but please feel free to tell me any personal concerns or any concerns that you may have." (Attwell dep. at 326).

Lastly, Mr. Rogers' offer to run with Ms. Attwell and give her a treadmill apparatus if she picked it up at his home were made while Rogers, Attwell and Holly Elhers, a female administrative assistant, were eating lunch in the conference room. According to Ms. Elhers (Defs' mot. for s.j., affidavit of Holly Elhers), during the chit-chat over lunch, Ms. Attwell and Ms. Elhers mentioned that they occasionally jogged. Rogers said he runs several miles on the mall after work and that Ms. Attwell and Ms. Elhers were welcome to join him. They both commented that they were not interested because he ran too far. The matter was dropped and the conversation turned to other matters. At one point, Ms. Attwell said that she prefers to exercise indoors. Mr. Rogers replied that he had an unused treadmill at home which either Ms. Attwell or Ms. Elhers was welcome to have, provided it was picked up at his house because it was too unwieldy to transport on the Metro. Ms. Attwell's testimony is not substantially different. She recalls that while

lunching with Ms. Elhers and Mr. Rogers, she remarked that she "used to go running in the evening with her boyfriend, but [they] broke up, so [she didn't] have anyone to run with anymore." To which Mr. Rogers replied: "how far do you run? Maybe we could go running sometimes. I run on the Mall." Then, in response to Ms Attwell's inquiry as to how far he ran, he replied "six miles". Since that distance was farther than her usual two-mile run, Ms. Attwell mentioned that "actually [she] was considering a treadmill, because, that way, it doesn't matter what [the] time of [the] day. [She] could always use that in [her] house." Mr. Rogers replied that he had a treadmill that he inherited together with a lot of other exercise equipment, and that she was welcome to come and get the treadmill. He also described some of the functions and details of the treadmill.

I conclude that when put in proper context and when viewed in the "totality of the circumstances," Mr. Rogers remarks do not rise to the level of *verbal* advances of a sexual nature sufficient to create a hostile or abusive working environment. Accordingly, as Ms. Attwell has failed to proffer evidence that would support a claim for creating and/or maintaining a sexually hostile work environment, the defendants' motion for summary judgment on Count V will be granted.

**B) *Denial of Promotion***

■ Ms. Attwell contends that she was denied a promotion because of her race. She asserts claims under the DCHRA [Count VI] and under 42 U.S.C. § 1981 [Count VII]. The legal standards applicable to race discrimination are the same under the DCHRA and § 1981. *Thompson*, 614 F.Supp. at 1011.[7]

■ Although the evidence of record is sufficient to satisfy the first three elements of her cause of action: (1) membership in a protected class, (2) qualification for promotion, and (3) rejection, *Sutherland*, 631

---

7. The Civil Rights Act of 1994 expanded the application of § 1981. It did not change the elements of a cause of action.

A.2d at 361, Ms. Attwell has failed to produce evidence with respect to the fourth factor, viz., that her race was a factor, much less a substantial factor, in her discriminatory treatment. In order to satisfy this element of her cause of action, this plaintiff would have to offer some evidence from which a trier of fact could find that the basis for any discriminatory treatment was race.

She argues that upon her late arrival for work on October 16, 1995, she was berated by Rogers for being late. No reasonable person could find that the basis for the reprimand was her race. The evidence is undisputed that the only aspect of the Million Man March that she attended was the 6:00 a.m. prayer breakfast. She was not late because of her attendance at the breakfast but because she went home and slept after attending the breakfast rather than proceeding to work. As it developed during the course of the pretrial discovery proceedings, Ms. Attwell had been out all night with Mr. Beckwith at an after-hours club. Although a liberal leave policy was in effect, that did not relieve Ms. Attwell of the obligation, much less the common courtesy expected of a responsible employee, to telephone her employer to inform him that she was taking advantage of the liberal leave policy and would be late for work. She just came in late. In contrast, another black employee, Fred Jasper, informed Rogers in advance that he intended to take the day off. On his return the day after the March, he was not disciplined nor admonished. There is nothing in the record from which a finder of fact could conclude that race played a part in the decision not to promote.

In her second amended complaint, Ms. Attwell contends she was discriminated against when an October 17, invitation to audition for the position of Director of Student Services (Pls' 2d amend. compl., ¶ 29) was postponed, (Id. ¶ 31) and Belinda Lee, a white female (later determined to be Asian (Attwell dep. at 117)), was hired as the Placement Manager without audition. (Id. ¶¶ 32 and 33). From these allegations, we are led to believe that Ms. Attwell was denied the opportunity to audition, and that Ms. Lee, a "white" female, was hired for the re-named vacant position.

However, Ms. Attwell's deposition clearly shows that she did audition on October 18, before Oxman, Rogers, Susan Ross and Gala Martin (Attwell dep. at 112). Moreover, prior to November 1, the date on which she filed this suit, as well as prior to the date on which Ms. Lee was hired as the part-time Placement Manager, Mr. Oxman told Ms. Attwell that he was contemplating some changes in the personnel structure of the Learning Center (Attwell dep. at 113), and that instead of filling the vacant Director of Student Services position, he decided to create a part-time position of student Placement Manager. Later, by way of follow-up to that idea, he told her that he appointed a racial minority female to the newly created position. (Attwell dep. at 114, 115, and 117). In the absence of additional evidence, a reasonable person would have to engage in gross speculation to find that the decision not to promote Ms. Attwell and instead to hire a minority (an Asian) female to perform on a part time basis, a discreet part of the duties of the vacant position was *substantially* racially motivated. Accordingly, the defendants' motion for summary judgment on the claim of discrimination in failing to promote will be granted. (Count VI and Count VII).

## C. *Retaliation*

■■■ Lastly, Ms. Attwell contends that she was denied a promotion to the position of Director of Student Services in retaliation for having attended the Million Man March Prayer Breakfast (Attwell dep. at 118–121). As discussed earlier (*supra* pp. 1041–1042), the March and its related events were not a "statutorily protected activity." Accordingly, reliance on the belief that she was denied a promotion in retaliation for having attended the prayer breakfast is insufficient to support a *prima facie* case of retaliating under the DCHRA. (Count VIII).

## III. *Hodges*

### A) *Discrimination Claim*

In Count IX of the Second Amended Complaint, Mr. Hodges charges the defendants

with violations of § 1–2525 of the DCHRA[8] alleging he was "subject[ed] ... to demeaning treatment and demoted ... without cause." (Pls' 2d amend. compl., ¶ 77).

■ For claims of employment discrimination under the DCHRA, the courts look to Title VII of 42 U.S.C. § 2000e *et seq.* (1982) to determine the elements of a cause of action and the allocation of the burdens of production. *Atlantic Richfield Co. v. D.C. Comm'n on Human Rights,* 515 A.2d 1095, 1098 (D.C.1986).

■ "To establish a *prima facie* case of discrimination under the DCHRA, a plaintiff must show that: (1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) employees who were not members of the protected class were not subject to similar treatment." *Lempres v. CBS Inc.,* 916 F.Supp. 15, 21 (D.D.C.1996).

Mr. Hodges, a black male, contends he suffered adverse employment action in the form of repeated unfair criticism of him by Mr. Rogers, while his colleague, Cara Davis, a white female, did not encounter similar criticism.

The criticism about which he complains concerned his student enrollment production (Hodges dep. at 278) and his failure to restrict his employment activities to his assigned tasks.[9] He also complains that Mr. Rogers permitted Ms. Davis to leave work early, whereas he was required to work his full shift (Id. at 283–85) and, lastly, that Mr. Rogers used a different tone of voice when addressing him than used in speaking to Ms. Davis. (Id. at p. 286).

In response to Mr. Hodges' complaint of unfair criticism of his production, the defendants have submitted the Learning Center's weekly statistical memos for the months of May–July 1995; these memos compare the production of Ms. Davis and Mr. Hodges.

The records reveal that for the week ending May 4, Mr. Hodges had 17% of his leads resulting in student enrollments, whereas Ms. Davis had 20% of her leads enrolled in the school. The Learning Center's goal was to enroll 20% of the leads. For the week ending May 11, Mr. Hodges enrolled 15% of his leads, whereas Ms. Davis enrolled 18% of her leads. For the week ending May 18, Ms. Davis enrolled 40% of her leads, whereas Mr. Hodges only enrolled 9% of his. For the week ending May 25, Ms. Davis enrolled 29% of her leads in contrast to Mr. Hodges' enrollment of 10% of his leads. During that same period, the total dollar value of the sales (enrollments) generated by Ms. Davis amounted to $96,975, whereas Mr. Hodges' enrollments resulted in a sales volume of $60,990. The overall goal of each admissions representative for this period was $60,000. While Mr. Hodges barely met his monetary goal, Ms. Davis far exceeded her goal. The weekly memos also show that Mr. Hodges never met the goal of enrolling 20% of the leads contacted, whereas Ms. Davis exceeded that goal 3 of the 4 weeks. (Defs' mot. for s.j., ex. h).

The two memos for the month of June 1995, disclose that Mr. Hodges again failed to meet the enrollment goal of 20%, barely made his dollar volume goal for the week ending June 8, and produced only 50% of the enrollment dollar volume goal for the week ending June 22. (*Id.*).

8. § 1–2525 of the Human Rights Act makes it unlawful to "coerce, threaten, retaliate against ... interfere ... intimidate or discriminate against ..." another for having opposed in any manner practices made unlawful by the Act. However, in neither the complaint nor opposition to the defendants' motion for summary judgment has Mr. Hodges raised issues relating to coercion or retaliation. Instead, he argues that he was discriminated against in the terms and conditions of his employment and constructively discharged, issues more appropriately raised under § 2511 and 2512 of the DCHRA. The defendants have treated Mr. Hodges' complaint as one for discrimination in the terms and conditions of employment and not as one for retaliation. It appears that the reference to § 2525 was typographical and will be treated as such.

9. On occasion, he provided a financial receipt to a student which was the responsibility of another employee (Hodges dep. at 279–281); on another occasion he provided a copy of his resume to a student to use as a sample (Id. at 297–298); and on another occasion he went to a classroom instead of remaining at the admissions representative's desk. (Id. at 298).

The records for July 1995, follow a similar pattern of failure to meet enrollment goals with only 14% and 16% of leads resulting in enrollments notwithstanding that Ms. Davis had resigned in July leaving Mr. Hodges as the only Admissions Representative at that time. (*Id.*).

■ These figures, not refuted by Mr. Hodges, amply support the defendants contention that their criticism was justified. In fact, Mr. Hodges conceded that Ms. Davis met the targeted goals on a more consistent bases than he. (Hodges dep. at 388). An employer has every right to criticize an employee's failure to meet its legitimate business expectations, and this evidence, which is not challenged by Mr. Hodges, amply supports the defendants' contention that their criticism of Mr. Hodges was justified and business related.

Mr. Hodges' complaint that he was subject to disparate treatment because his request to leave work early was denied arises out of one incident. (Id. at 284). It appears that late one afternoon Mr. Hodges requested to leave early (Id. at 283 and 348), and Mr. Rogers denied this request because Ms. Davis already had left for the day so Mr. Hodges' early departure would have left the school without any admissions representative coverage. (Id. at 348). Mr. Hodges has failed to show that this explanation was pretextual and not business related.

Mr. Hodges' additional claims of disparate treatment—being admonished for writing a receipt for a student, leaving his desk in order to go to a classroom and providing a copy of his resume to a student for use as a sample—are mere isolated instances of perceived criticism.

■ In order for criticism to rise to the level of actionable harassment, the harassment "must be sufficiently severe or pervasive to alter the conditions of [the victims] employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) (internal quotation omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an en-

vironment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

■ The Court concludes that a reasonable person could not find these isolated examples of harassment as well as Mr. Hodges' complaints of Mr. Rogers' tone of voice when addressing him as creating an abusive or hostile working environment so as to be actionable under the DCHRA. As the Supreme Court observed "mere utterance ... which engenders offensive feelings in an employee ... [do] not sufficiently affect the conditions of employment to implicate Title VII." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370.

Mr. Hodges further complains that he was demoted without cause. His employment at the Learning Center began after he responded to a newspaper advertisement placed by the Learning Center for a full time Admissions Director. He contends that since he responded to this ad and was hired, he was therefore hired for that position. He concedes, however, that neither Mr. Rogers nor Mr. Oxman ever told him he was hired as the Admissions Director. (Hodges dep. at 183, 184 and 219). Moreover, on the very day he commenced employment with the Learning Center, Mr. Hodges filled out two Learning Center forms on both of which he identified in his own handwriting his job position or title to be "admissions representative". (Defs' mot. for s.j., exs. e and f).

Furthermore, Mr. Hodges conceded during his deposition that he never referred to himself as Director of Admissions (Hodges dep. at 258); never participated in management meetings (Id. at 261); never exercised any supervisory responsibility over Cara Davis (Id. at 356); never exercised any supervisory responsibility over the administrative staff (Id. at 493); never counseled the administrative staff (Id. at 493); and never prepared any training materials nor meetings agenda (Id. at 493 and 494). In sum, he never performed any of the duties or functions of a Director of Admissions. (Id. at 495). Moreover, he admitted that his business card identified him as an admissions

representative (Id. at p. 481); that he and Ms. Davis performed exactly the same admissions representative duties (Id. at 494 and 495); and that those duties remained the same throughout his tenure at the Learning Center (Id. at 495).

Although he responded to an advertisement for the position of Admissions Director, it does not necessarily follow that he was hired for that position. Unless he can establish that he was hired for that position, his claim of a having been demoted is without factual support. The first time Mr. Hodges ever identified himself as an admissions director or as director of admissions occurred when he filed this lawsuit. It is clear beyond doubt that during his tenure at the Learning Center, which ended two months prior to the filing of this lawsuit, Mr. Hodges was and knew he was an admissions representative, not Director of Admissions, Admissions Director or some other combination of those titles.

Moreover, it is equally clear that during his tenure with the Learning Center, all the terms, conditions and privileges of his position never changed. He performed the duties of an admissions representative and was paid the corresponding salary. While it is not necessary that a plaintiff show economic loss or some other tangible loss in order to prove demotion, it is axiomatic that if the claim of demotion is based on loss of title, he must show that he, in fact, was vested with the title he now claims he lost. An employee does not establish his own title. It is the prerogative of the employer to set job titles and performance standards. In the absence of objective evidence showing that Mr. Hodges was hired as the Director of Admissions or Admissions Director and was later removed from that position to a lesser position for discriminatory reasons, he has failed to make a *prima facie* showing that he suffered an adverse employment action or was discriminated against in the terms, conditions and privileges of employment in violation of the DCHRA.

Lastly, Mr. Hodges complains that the defendants failure to grant a promised advancement and promotion, which had induced him to accept employment with the Learning Center in the first place, caused him to be constructively discharged. [Pls' 2d amend. compl., ¶ 44].

" 'A constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit.' " *Sutherland,* 631 A.2d at 361 (quoting *Atlantic Richfield Co.,* 515 A.2d at 1101). Moreover, the constructive discharge must be "justified by the existence of certain aggravating factors." *Clark v. Marsh,* 665 F.2d 1168, 1174 (D.C.Cir.1981) (internal quotation omitted). It "requires a finding of intentional discrimination plus a finding of 'aggravating factors' that suggest the complainant was driven to quit." *Bishopp v. D.C.,* 788 F.2d 781, 790 (D.C.Cir.1986). Discriminatory failure to promote unaccompanied by "aggravating factors" will not sustain a finding of constructive discharge. *Dashnaw v. Pena,* 12 F.3d 1112, 1113 (D.C.Cir.1994).

Not only has Mr. Hodges failed to carry his statutory burden of establishing his underlying claim of intentional discrimination, he has also failed to provide any evidence of "aggravating factors" which would cause a reasonable person to resign his employment. Absence evidence with respect to these elements, his claim that he was constructively discharged must fail. *Katradis v. Dav–El of Wash., D.C.,* 846 F.2d 1482, 1485 (D.C.Cir.1988).

## IV. *Joint Claim*

The plaintiffs have joined together claiming in Count X that white employees have received promised promotions and advancements whereas black employees have been denied, solely because of their race, similar promises of promotion and advancement. "Such class-wide allegations of discrimination are commonly referred to as 'pattern or practice' cases." *Segar v. Smith,* 738 F.2d 1249, 1266 (D.C.Cir.1984) cert. den. 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). As with any claim of disparate treatment, a plaintiff carries the initial burden of production. In "pattern or practice" cases "(t)his usually means providing evidence— often in statistical form—of a disparity in the position of members of the plaintiff class and *comparably qualified* whites." *Segar,* 738

F.2d at 1267. In this case, the plaintiffs have offered no evidence beyond that relied on to support their individual claims, which the Court has found to be insufficient. In order to survive a well-pleaded and documented motion for summary judgment, a plaintiff or group of plaintiffs must present evidence to support a pattern or practice of discriminatory treatment and may not rely on collective anecdotal allegations. The absence of evidence to support their allegations is fatal to this claim. Therefore, the defendants' motion for summary judgment on Count X will be granted.

An appropriate order accompanies this memorandum opinion.

### ORDER

Upon consideration of the defendants' motion for summary judgment, the oppositions, replies, the entire record and the applicable law, it is this 27th day of November 1996:

**ORDERED** that the defendants' motion for summary judgment is **granted.**

**FURTHER ORDERED** that judgment be, and hereby is, entered in favor of the defendants Career Blazers Learning Center of Washington, D.C., Inc. and John Rogers against the plaintiffs Charles Beckwith, Cordelia Attwell and Ervin Hodges.