Ann CARTER–OBAYUWANA,
Appellant,

v.

HOWARD UNIVERSITY, Appellee.

No. 99–CV–909.

District of Columbia Court of Appeals.

Argued Nov. 1, 2000.
Decided Jan. 4, 2001.

Richard A. Salzman, with whom Douglas B. Huron, Washington, DC, was on the brief, for appellant.

Christopher Schwartz, with whom Jennifer M. Smith, Washington, DC, was on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and FERREN, Senior Judge.

SCHWELB, Associate Judge:

This case arises from allegations by the plaintiff-appellant, Dr. Ann Carter–Obayuwana, that Howard University and one of its professors, Dr. Frederick D. Harper, who supervised the plaintiff, retaliated against her for engaging in activity protected both by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1994 & Supp. IV 1998), and by the District of Columbia Human Rights Act (DCHRA), D.C.Code §§ 1–2501 *et seq.* (1999 & Supp.2000). The plaintiff claims that, in reprisal for her complaints regarding Dr. Harper's allegedly discriminatory conduct, the University reduced her salary for a semester, then continued to pay her the lower salary for an additional year, and subsequently denied her application for reappointment to the University's Graduate Faculty.

At the initial trial of this case before Judge Lee F. Satterfield, the jurors were unable to reach a verdict regarding the plaintiff's retaliation claim. At the second trial, before Judge Susan R. Winfield, the judge excluded all evidence of the initial reduction of the plaintiff's salary, and she granted the University's motion for a directed verdict with respect to the plaintiff's remaining retaliation claims. We conclude that the judge erred in excluding evidence of the initial salary reduction. Accordingly, we reverse.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The dispute.*

The plaintiff is a tenured Associate Professor at Howard University. Since the

fall of 1974, she has been teaching graduate and post-graduate courses in the counseling and psychology program offered by the School of Education's Department of Psychoeducational Studies. During most of her time at Howard, her relationship with the University appears to have been satisfactory both to her and to the administration. Dr. Carter–Obayuwana received tenure after six years, and she served repeatedly as the Area Coordinator of the Counseling Area, *i.e.*, in a leadership role in her department. In 1980, she was accepted without opposition to membership in the University's Graduate Faculty.[1]

In the early 1990s, however, the plaintiff began experiencing difficulties with her superiors and with the University's administration. In 1992, Dr. Frederick D. Harper was appointed Chairman of the University's Department of Psychoeducational Studies, and in that capacity, he became the plaintiff's supervisor. By all accounts, Dr. Harper and Dr. Carter–Obayuwana have a less than harmonious relationship, although the parties disagree on what exactly caused the relations between them to sour.[2] In any event, sour they did, and what began as a personal quarrel developed into the legal controversy that has now made its way to this court.

During the fall of 1992, Dr. Harper admonished the plaintiff for allegedly missing office hours and for other real or perceived failings. On December 15, 1992, the plaintiff responded angrily and in writing to what she apparently regarded as a baseless reproof. In her memorandum, the plaintiff complained, *inter alia*, that Dr. Harper had a "sexist mentality" towards her. She stated that she "will not hesitate to seek advice and/or redress outside the University if your [Dr. Harper's] sexism ... do[es] not cease." The plaintiff sent copies of her memorandum to Dr. Mary E. Rhodes Hoover, who was then the Dean of the School of Education, and to Dr. Joyce A. Ladner, the University's Vice–President for Academic Affairs.

This initial exchange of memoranda was followed by unsuccessful attempts at mediation by the Dean of the School of Education, and the tense situation between the two protagonists continued for several more months.[3] Things finally came to a head in the fall of 1993, shortly before the beginning of the fall semester. At that time, the plaintiff had made plans to attend a conference in Toronto. On August 18, 1993, the very day that the plaintiff had arranged to leave for Canada, and shortly before her scheduled departure for the airport, Dr. Harper called the plaintiff into

1. Howard University's Graduate Faculty consists of professors who teach graduate and post-graduate students, but membership in the Graduate Faculty is not a prerequisite for such teaching assignments. In fact, although she is not a Graduate Faculty member, the plaintiff currently teaches graduate and post-graduate students. Appointment to the Graduate Faculty is for a three-year term, and candidates for membership must apply to a committee consisting exclusively of other Graduate Faculty members. Members of the Graduate Faculty do not receive additional remuneration. Rather, membership enhances a professor's standing in the University's academic community and his or her access to professional opportunities. Only Graduate Faculty members are eligible to chair dissertation committees, and the Graduate Faculty has separate meetings at which policies regarding graduate students are established and discussed. Graduate Faculty members also have access to additional sources of grants, and members are sought after by the most promising students.

2. Dr. Harper and Dr. Carter–Obayuwana have been colleagues since the 1970s. Prior to 1992, they were peers. The plaintiff attributes her difficulties with Dr. Harper to her refusal to date him earlier in her career, and to Dr. Harper's allegedly negative reaction to this rebuff. Dr. Harper, on the other hand, claims that the problems have been caused by lack of professionalism on the plaintiff's part and by her "libelous statements, threats, and accusations" about and against him.

3. Dr. Carter–Obayuwana testified that she repeatedly expressed her willingness to meet with University personnel to resolve the issues between her and Dr. Harper. Dr. Harper, however, declined to participate, apparently on the advice of counsel.

a meeting with him and another university official. At that meeting, the plaintiff was informed that, in addition to the two courses previously assigned to her for the fall semester, she would be required to teach a third course (Vocational Theories). The academic year was scheduled to begin a few days later, which meant that the plaintiff would be expected to take over the new class prior to the date on which she had been intending to return to Washington from Toronto. Dr. Harper told the plaintiff that the additional assignment had been made because her courseload was too low while that of Dr. Alan Stills, the professor previously assigned to teach Vocational Theories, was too high.[4] It is undisputed that the plaintiff refused to agree, on such short notice, to teach the Vocational Theories course; she also protested that she could not adequately prepare for the assignment within the allotted time. Dr. Carter–Obayuwana apparently did offer to take over Dr. Stills' course in Multicultural Counseling. After a fruitless discussion in which neither side gave any ground, the plaintiff terminated the meeting and left for Toronto.

Upon her return to Washington on August 25, 1993, the plaintiff informed Dr. Kriner Cash, the Dean of the School of Education, of the events that had transpired immediately before her departure. She complained that she had been subjected to "ongoing harassment and unfair treatment" and that the "grievances enumerated in [her] December 15, 1992 letter remain[ed] unaddressed and unresolved." The plaintiff subsequently met with Dr. Cash, and she told him that she would not teach the Vocational Theories class because she did not have the requisite "moral and professional conscience" to do so. Meanwhile, Dr. Harper advised Dr. Portia H. Shields, the new Dean of the School of Education, that Dr. Carter–Obayuwana had refused to accept the assignment to teach the Vocational Theories class. He asserted that "Dr. Carter–Obayuwana was assigned this class more than a year ago," cf. note 4, supra, and he urged an "immediate investigation and subsequent appropriate action concerning this serious incident." [5]

On September 2, 1993, Dr. Shields formally directed the plaintiff to assume responsibility for the Vocational Theories course. She informed the plaintiff that failure to comply with this directive would result in the imposition of discipline for neglect of duty, in accordance with the University's Faculty Handbook.[6] The plaintiff apparently believed that the belated assignment was part of a retaliatory scheme against her, and she persisted in her refusal to teach the class.

On September 13, 1993, the plaintiff sent another letter to Dr. Ladner, the Vice President of Academic Affairs, as a follow-up to her earlier memorandum of December 15, 1992. The reader will recall that Dr. Ladner was one of the persons to whom a copy of the 1992 memorandum had been directed. In the September 13 letter, after referring to her earlier memorandum, the plaintiff wrote that she was "saddened to inform" Dr. Ladner that "the many issues of unfairness, harassment, and discriminatory behavior on the part of Dr. Harper, as protested in that letter, still

---

**4.** The University contends that the plaintiff had really been expected to teach the Vocational Theories class from the outset, and that the assignment to Dr. Stills was simply a clerical error. According to Dr. Carter–Obayuwana, on the other hand, the Vocational Theories course was a completely new assignment of which she had been advised, for the first time, only five days before the beginning of the semester.

**5.** The plaintiff ultimately taught neither Vocational Theories nor Multicultural Counseling during the fall semester, and her courseload was therefore below that normally required of a full-time tenured faculty member.

**6.** According to the Faculty Handbook, "[d]isciplinary actions against faculty members may include ... temporary or indefinite reduction in pay and/or rank." One of the "grounds for disciplinary action" is "neglect of duty."

exist." She requested a meeting at which she could present documentation of the "harassment" to which she claimed to have been subjected. No meeting was arranged, however, and Dr. Ladner apparently did not respond to the plaintiff's letter of September 13, 1993.

On September 15, 1993, Dr. Shields informed the plaintiff that she intended to recommend, on the following day, that the plaintiff's salary for the 1993 fall semester be reduced by twenty percent because of the plaintiff's refusal to teach the Vocational Theories class. In October 1993, the President of the University ordered that the plaintiff's salary be reduced as proposed by Dr. Shields. Dr. Carter–Obayuwana did not formally appeal from this disciplinary action. While the salary reduction was supposed to be in effect only during the 1993 fall semester, the plaintiff's prior pay scale was not restored until April 1995.[7]

B. *The complaint to the Office of Human Rights and its aftermath.*

In the meantime, on August 17, 1994, the plaintiff took her first step towards securing legal redress. On that date, she filed a complaint with the District of Columbia's Office of Human Rights (OHR). In her complaint, she alleged that the University had engaged in employment discrimination against her on account of her sex and had retaliated against her for exercising her rights. The retaliation claim included, *inter alia*, an allegation that her salary had been reduced for the 1993 fall

semester in reprisal for having engaged in protected activities. The OHR "cross-filed" the complaint with the federal Equal Employment Opportunity Commission. On February 12, 1996, following an investigation of the plaintiff's allegations, the OHR found "no probable cause to believe that a violation of the D.C. Human Rights Act" had occurred. (Emphasis omitted.) [8] The plaintiff did not seek judicial review of the OHR's determination.

In May 1995, nine months after she had filed her OHR complaint, the plaintiff applied for reappointment to Howard University's Graduate Faculty. In order to be eligible for reappointment, the plaintiff was required to show, *inter alia*, that she had conducted research on, and had published, at least one peer-reviewed article, book, or chapter since her last appointment to the Graduate Faculty.[9] The plaintiff presented four articles with her application, and she asserted that each one had received peer-review. The plaintiff did not, however, submit any documentation showing that that peer-review had taken place.

On February 6, 1996, the Departmental Committee on Appointments, Promotions, and Tenure (APT) advised the plaintiff that her application for reappointment had been denied on account of her failure to submit a peer-reviewed article. Both Dr. Stills and Dr. Moses, who were aware of the plaintiff's OHR complaint, participated in the APT Committee's initial discussions, but neither of them voted on the applica-

7. The parties disagree over the circumstances under which Dr. Carter–Obayuwana's salary was belatedly restored. The plaintiff claims that the University intentionally maintained her at the lower rate of pay even after the expiration of the 1993 fall semester. According to the plaintiff, she repeatedly complained to Dr. Shields that she was still being paid only eighty percent of her salary, but that Dr. Shields "brushed [her] off." The University asserts, on the other hand, that the continued payment of the reduced salary after the end of the fall semester was "inadvertent" and an "administrative snafu." In any event, in February 1996, the plaintiff received a lump sum

payment of $8,000 to compensate for the University's failure to restore her full salary in timely fashion. The plaintiff claims that the amount paid to her at that time was insufficient.

8. The OHR took no testimony from any of the principals, and the Office thus made its "no probable cause" determination without being able to assess their credibility or demeanor.

9. A peer-reviewed article is one that has been presented for comment, prior to publication, to editors and other scholars in the field.

tion.[10] During the proceedings before the Committee, Dr. Stills expressed his belief that the plaintiff's articles had not been peer-reviewed. The record does not contain any evidence, however, that either Dr. Stills or Dr. Moses mentioned the plaintiff's OHR complaint to the members of the APT Committee or attempted in any other inappropriate way to induce them not to re-admit the plaintiff to membership.

After her application had been denied, the plaintiff belatedly secured letters from the publishers of her articles establishing that her writings had, in fact, been peer-reviewed. She did not, however, formally submit these materials to the APT Committee, nor did she appeal from the Committee's decision. As of the date of the second trial, Dr. Carter–Obayuwana had not been reappointed to the Graduate Faculty.

## C. *The Superior Court litigation and the first trial.*

In July 1996, the plaintiff instituted suit in the Superior Court against Howard University and Dr. Harper pursuant to Title VII and the DCHRA. She alleged, *inter alia,* that she had been subjected to sex discrimination and that she had suffered retaliation for exercising her rights. The retaliation of which she complained was alleged to have included the reduction of her salary, the University's failure to restore the salary in timely fashion, the untimely assignment to her of the Vocational Theories course, and the denial of reappointment to the Graduate Faculty.[11]

Following the filing of the complaint, the attorneys conducted discovery, and each party subsequently filed a motion for summary judgment. Judge Satterfield granted the University's motion in part, holding that those claims under the DCHRA which the plaintiff had previously presented to the OHR could not proceed since the plaintiff had failed to seek judicial review after that agency had made a finding of no probable cause.[12]

The case went to trial in October 1997, and at the conclusion of the plaintiff's case, the judge granted a defense motion for a directed verdict with respect to Dr. Carter Obayuwana's sex discrimination claims under Title VII. The judge ruled, however, that the plaintiff had presented sufficient evidence to go to the jury on her claim of retaliation, which the parties understood at that time to be based both on the DCHRA and on Title VII.[13] Ultimately, the jurors were unable to agree upon a verdict, and the judge declared a mistrial.

In advance of the second trial, the plaintiff moved to supplement her complaint to allege additional acts of retaliation, which were said to have occurred after the first trial.[14] This motion was denied by Judge

10. Drs. Moses and Stills were the only faculty members even arguably involved with Dr. Carter–Obayuwana's reapplication to the Graduate Faculty who were shown to have been aware that she had filed a complaint with the OHR.

11. In her complaint, Dr. Carter–Obayuwana also asserted a common law claim of breach of contract. This claim was disposed of prior to the first trial and is no longer a part of the case.

12. Under the DCHRA, an employee who has elected to have her claims resolved by the OHR, and who has failed to seek judicial review of an adverse finding by that Office, is precluded from instituting an independent lawsuit under the Act. D.C.Code § 1–2556(a);

see also id. § 1–2554 (providing for judicial review of OHR determination); *Brown v. Capitol Hill Club,* 425 A.2d 1309, 1311–12 (D.C. 1981). In this appeal, the plaintiff does not challenge Judge Satterfield's disposition of this issue.

13. Some of the plaintiff's retaliation claims under the DCHRA involved events that occurred after she filed her complaint with the OHR. Because the plaintiff had not brought these claims before the OHR, she was not precluded by the doctrine of election of remedies, *see Brown, supra,* note 12, 425 A.2d at 1311–12, from seeking judicial redress for those claims.

14. According to the plaintiff, Dr. Harper and others had, *inter alia,* made and circulated

Reggie B. Walton. The plaintiff then filed a second action in the Superior Court (No. 98–8611) based on the most recent alleged reprisals. The plaintiff subsequently moved to consolidate the two cases, but this motion was denied by Judge Winfield, who had been assigned to handle the case. Judge Winfield also ruled that the plaintiff would not be permitted to introduce at the second trial evidence regarding events that were alleged to have occurred after October 1997.

### D. *The second trial.*

The case came to trial for the second time on June 7, 1999, more than one and one half years after the first trial had ended in a mistrial. Judge Winfield ruled, as a preliminary matter, that the plaintiff's retaliation claim, as articulated in the complaint, was based entirely on the DCHRA, and that the plaintiff had failed to allege retaliation in violation of Title VII. The judge therefore held that the initial reduction of the plaintiff's salary in 1993 was out of the case—the claim was precluded under the DCHRA because the plaintiff had presented it to the OHR, and it could not be presented under Title VII because, as the judge read the complaint, no claim under that statute had been adequately alleged. The trial then proceeded solely with respect to those claims of retaliation that had not previously been presented to the OHR, namely, that the University had continued to pay the plaintiff a reduced salary and had denied her reappointment to the Graduate Faculty, all allegedly in reprisal for her complaint to the OHR in August 1994.[15] At the conclusion of the plaintiff's case, the judge ruled as a matter

of law that the plaintiff had failed to establish the requisite causal nexus between the protected activity and the allegedly retaliatory acts. The judge therefore granted the University's motion for a directed verdict with respect to the plaintiff's remaining claims. This appeal followed.

### II.

### LEGAL ANALYSIS

■ The central issue presented by this appeal is whether the judge at the second trial erred by excluding evidence of the initial reduction of the plaintiff's salary. The plaintiff contends, contrary to the second trial judge's ruling,

1. that the complaint, fairly construed, alleges retaliatory conduct by the defendants in violation of Title VII (as well as in contravention of the DCHRA);[16] and

2. that the plaintiff engaged in protected activity prior to the reduction of her salary, so that the jury should have been permitted to determine whether that reduction was in fact retaliatory.

The plaintiff also asserts that the judge erred in denying Dr. Carter–Obayuwana's motion to consolidate her two complaints.

### A. *The plaintiff's invocation of Title VII as a basis for her retaliation claim.*

■ The plaintiff first challenges Judge Winfield's ruling that the allegations of retaliation in the complaint were based solely on the DCHRA. This contention is critical to the plaintiff's case for, as we have noted previously, her claim that the initial salary reduction was retaliatory had been presented to the OHR, which had

---

false defamatory comments about her and had urged a new faculty member not to associate with her, all in reprisal for her allegations of sex discrimination and her complaint to the OHR.

15. Judge Winfield apparently understood Judge Satterfield to have ruled that the plaintiff's memorandum of December 15, 1992 was not protected activity, and in a written order, she followed that ruling under the doctrine of

"the law of the case." The judge concluded, in effect, that the reduction of Dr. Carter–Obayuwana's salary in 1993 preceded any protected activity, so that it could not form the foundation for a retaliation claim.

16. State courts have concurrent jurisdiction with federal courts over civil actions brought pursuant to Title VII. *See Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990).

found no probable cause. Having failed to seek judicial review of that finding, the plaintiff is barred by the doctrine of election of remedies from litigating the DCHRA retaliation claim in court. *See Brown, supra* note 12, 425 A.2d at 1311–12. Dr. Carter–Obayuwana's resort to an administrative complaint to the OHR does not, however, preclude her from pursuing the claim under civil rights law. This is so because Title VII confers upon the plaintiff the right to *de novo* judicial consideration of her allegations. *Eg. Univ. of Tenn. v. Elliott,* 478 U.S. 788, 795–96, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). "Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." *Id.* at 796, 106 S.Ct. 3220.

The question whether Dr. Carter–Obayuwana's complaint alleges retaliation against her in violation of Title VII requires a careful examination of the entire pleading. Before focusing on the language of the complaint, however, we think it appropriate to consider, first, the applicable principles of construction and, second, the positions taken by the parties during the course of the litigation regarding the scope and meaning of the complaint. Each of these inquiries provides strong support for the plaintiff's position.

We begin with the principle that "liberal rules of pleading normally protect a plaintiff against dismissal of an ambiguous complaint when it can be said to state a claim if all reasonable inferences are drawn in the plaintiff's favor." *Bible Way Church of Our Lord Jesus Christ v. Beards,* 680 A.2d 419, 430 (D.C.1996). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Our rules "reject the approach that pleading is a game of skill in which one misstep ... may be decisive to the outcome." *Id.* at 48, 78 S.Ct. 99; *see also, e.g., Francis v.* *Recycling Solutions, Inc.,* 695 A.2d 63, 78 (D.C.1997). Rather, the rules "manifest a preference for resolution of disputes on the merits, not on technicalities of pleading." *Keith v. Washington,* 401 A.2d 468, 470 (D.C.1979). "[P]leadings shall be so construed as to do substantial justice." Super. Ct. Civ. R. 8(f). "[T]he purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citation omitted).

■ In construing the complaint, we must be particularly mindful of the fact that this is a civil rights case in which the defendants are alleged to have engaged in discrimination against the plaintiff based on sex and to have retaliated against her for exercising her rights under the civil rights statutes. "The right to equal opportunity without discrimination based on race or other such invidious ground[, including sex,] is protected by a policy to which both this nation and its capital city have accorded the highest priority." *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 626 (D.C. 1989) (internal quotation marks omitted) (quoting *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). "It is especially in civil rights disputes that we ought to be chary of disposing of [cases]" on the pleadings, for "courts do in fact have a predilection for allowing civil rights cases to proceed until a comprehensive record is available to either support or negate the facts alleged." *Sisters of Providence v. City of Evanston,* 335 F.Supp. 396, 399–400 (N.D.Ill.1971). Civil rights statutes are accorded a "generous construction" to ensure their "vitality." *Trafficante, supra,* 409 U.S. at 212, 93 S.Ct. 364; *see also Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 889 (D.C.1998). Dr. Carter–Obayuwana's complaint, which is grounded in two of these statutes, should be liberally construed with the foregoing principles in mind, and we should read her pleading as asserting a

retaliation claim under Title VII unless such a construction is plainly unreasonable.

Moreover, it appears that, before the second trial judge ruled otherwise, all parties-not only the plaintiff and the first trial judge, but also, quite explicitly, the defendants-viewed the case as including a Title VII retaliation claim. In the parties' Joint Pretrial Statement, which was filed prior to the first trial, the "Nature of the Case— *Defendants' View*" was described as follows: "Plaintiff Dr. Ann Carter–Obayuwana is suing Howard University and Dr. Frederick D. Harper for gender discrimination *and retaliation under Title VII* and the D.C. Human Rights Act." (Emphasis added.) In his order dismissing Counts I and II of the Complaint, Judge Satterfield specifically held that the plaintiff must be permitted to "proceed in Count Three *under Title VII* and the D.C. Human Rights Act." (Emphasis added.) The first trial on the retaliation count proceeded on that basis, without objection by the University.

■ The purpose of a pleading is to put the opposing party on notice of the nature of the pleader's claims. *See, e.g., Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C.1985); *Lee v. Foote*, 481 A.2d 484, 487 n. 8 (D.C.1984) (per curiam). Given the

parties' understanding, as reflected in the Joint Pretrial Statement, that the plaintiff had alleged retaliation in violation of Title VII, the University can assert no plausible claim of surprise or prejudice if the complaint is construed as including a claim under Title VII regarding the initial reduction in 1993 of the plaintiff's salary. Construction of the complaint as *not* including a retaliation claim under Title VII, on the other hand, would result in prejudice to the plaintiff, who had a right to rely on the University's understanding as reflected in the Joint Pretrial Statement. If the defendants had taken the position at the pretrial stage that they take now—namely, that retaliation in violation of Title VII was not alleged—then the plaintiff would have had the opportunity to seek leave to amend her complaint and to eliminate from the case the perceived defect in her pleading.

■ With these considerations in mind, we turn to the complaint itself. We have set forth in the footnote at the conclusion of this sentence all of those allegations in the plaintiff's pleading which bear on the issue under discussion, and we have italicized the language which, in our view, supports the plaintiff's reading of the complaint.[17] Although the complaint is not a

---

17. The relevant paragraphs of the complaint read as follows:

1. This is an action for declaratory judgment, compensatory damages, punitive damages, and reasonable attorney's fees and costs arising out of defendants' discrimination in violation of the District of Columbia Human Rights Act of 1977 as amended, D.C. Law 2–38, D.C.Code §§ 1–2501 *et seq.* (1992); *Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.;* and defendants' contractual and common law duties owed to plaintiff....
[Background Facts concerning] Retaliatory Conduct: Salary Reduction Without Due Process and Denial of Basic Resources
31. Howard University failed to give Dr. Carter–Obayuwana a hearing or a forum to air her grievance [against Dr. Harper]. Instead, Howard University *retaliated by reducing Dr. Carter Obayuwana's salary*....

COUNT I
(UNLAWFUL DISCRIMINATION IN VIOLATION OF TITLE VII AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT)
...
39. ... *Defendants' actions in reducing the salary of Dr. Carter–Obayuwana* constitute unlawful discrimination on the basis of gender *and retaliation* because defendants have not similarly reduced the salary of any male professors....

COUNT III
(REPRISAL AND RETALIATION)
44. *Plaintiff repeats and incorporates by reference the allegations contained in paragraphs 1 through 43 above.*
45. Defendants have taken numerous actions against Dr. Carter–Obayuwana, including, but not limited to refusal to return her salary to the proper level.
46. ... Defendants' continuing refusal to provide Dr. Carter–Obayuwana with a new computer violates the D.C. Human Rights Act....

model of clarity with respect to the statutory bases for each allegation,[18] it can, at the very least, be reasonably read as invoking Title VII for the plaintiff's claims of retaliation.

The first paragraph of the pleading states that the complaint is filed pursuant to both the DCHRA and Title VII. Paragraph 1. The alleged wrongs of which the plaintiff complains specifically include the initial reduction of her salary. Paragraph 31. Count I, which alleges "unlawful discrimination," is explicitly brought both under Title VII and under the DCHRA. The plaintiff alleges in paragraph 39, which is part of Count I, that the reduction of her salary constituted "unlawful discrimination ... *and retaliation*." (Emphasis added.) The retaliation claim is thus explicitly linked in the complaint to both statutory bases identified in the heading of Count I—the DCHRA *and Title VII*.

Count III of the complaint is entitled "Reprisal and Retaliation." In the first paragraph of this Count, the plaintiff explicitly repeats and incorporates by reference the prior allegations of the complaint. Paragraph 44. The pleader has thus reiterated in Count III, under the heading of "Reprisal and Retaliation," the allegation in paragraph 39 that the initial reduction of Dr. Carter–Obayuwana's salary was retaliatory. Paragraph 39, as we have seen, is part of a claim that is expressly based, *inter alia*, on Title VII.

The University points out, correctly, that in Count III, the plaintiff has specifically cited the DCHRA, but not Title VII. A careful reading of Count III, however, does not support the University's argument that the citation of the DCHRA, to the exclusion of Title VII, was intended to apply to the allegations regarding the original reduction of the plaintiff's salary. In

Paragraphs 46 and 48, the plaintiff has cited the DCHRA—but not Title VII—as the legal basis for complaining (1) of the University's refusal to provide her with a computer, Paragraph 46, and (2) of the denial of her application for reappointment to the Graduate Faculty, Paragraph 48. These are the only alleged reprisals specifically linked in the pleading solely to the DCHRA. The invocation exclusively of the DCHRA for these particular allegations might reasonably be construed as indicating that other claims of reprisal were not intended to be so restricted. *Expressio unius est exclusio alterius.* In any event, the pleader's implied disclaimer of Title VII in connection with a coveted computer, and in relation to a position with the Graduate Faculty, cannot logically be extended to the plaintiff's claim of a retaliatory reduction of her salary. Especially in light of the applicable principles of construction and the language of the Joint Pretrial Statement, we conclude that the complaint fairly invokes Title VII, as well as the DCHRA, as a statutory basis for the claim that the plaintiff's salary was reduced in 1993 in reprisal for her having engaged in protected activity.

### B. *The prima facie case of retaliation.*

Dr. Carter–Obayuwana's retaliation claim arises under Title VII's so-called "opposition clause," which makes it an unlawful employment practice "to discriminate against any individual ... because he [or she] has opposed any practice made an unlawful employment practice by this title." 42 U.S.C. § 2000e–3 (a); *see also Parker v. Baltimore & Ohio R.R. Co.,* 209 U.S.App.D.C. 215, 222, 652 F.2d 1012, 1019 (1981). It is an unlawful employment practice for an employer "to discriminate against any individual with respect to his

48. ... Defendants denied Dr. Carter–Obayuwana reappointment to the Graduate Faculty for discriminatory reasons, because of her gender and to retaliate against her for exercising the right to be free from discrimination, as guaranteed to her by the District of Columbia Human Rights Act.

(Italics added, underlines in original, bolding omitted.)

18. The complaint was prepared by prior counsel for the plaintiff.

compensation, terms, conditions, or privileges of employment, because of such individual's ... sex," 42 U.S.C. § 2000e–2 (a)(1), and the opposition clause thus makes it unlawful to retaliate against an employee for opposing sex discrimination in his or her workplace.

■ In order to make out a prima facie case of retaliation under Title VII's opposition clause, the plaintiff must demonstrate (1) that she was engaged in statutorily protected activity, (2) that her employer took an adverse employment action, and (3) a nexus between the two. *McKenna v. Weinberger*, 234 U.S.App.D.C. 297, 304, 729 F.2d 783, 790 (1984); *cf. Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n. 17 (D.C.1993) (relying on Title VII standard to establish requirements for prima facie showing of retaliation under DCHRA). "[T]he plaintiff does not have to prove that the conduct opposed was in fact a violation of Title VII." *Goos v. Nat'l Ass'n of Realtors*, 715 F.Supp. 2, 3 (D.D.C. 1989). "[T]he opposition activity is protected even when it is based on a mistaken good faith belief that Title VII has been violated." *Id.* (quoting *Love v. Re/Max of America, Inc.*, 738 F.2d 383, 385 (10th Cir.1984) (internal alterations omitted)).[19] "[M]aking the protected nature of an employee's opposition to alleged discrimination depend on the ultimate resolution of [her] claim would be inconsistent with the remedial purposes of Title VII." *Parker, supra*, 209 U.S.App.D.C. at 222, 652 F.2d at 1019.

The dispositive issue in this case is whether the plaintiff engaged in protected activity prior to the employer's alleged acts of reprisal. More specifically, the relevant question is whether in writing her letter of December 15, 1992 the plaintiff was exercising rights secured by Title VII.

Both trial judges appear to have assumed that the plaintiff did not engage in protected activity until August 1994, when she filed her complaint with the OHR. At the first trial, Judge Satterfield allowed the retaliation count to go to the jury under Title VII, but he excluded from evidence testimony regarding any events that occurred prior to August 1994. At the second trial, Judge Winfield relied on Judge Satterfield's earlier ruling as the basis for her decision excluding any evidence concerning the University's reduction in 1993 of the plaintiff's salary. According to Judge Winfield, "[t]he protected activity was determined by Judge Satterfield to be the formal filing of a discrimination complaint before the EEOC in either August or September 1994."

■ Whether actions by an employee constitute protected activity is a question of law, and we therefore review the trial courts' conclusions *de novo. See, e.g., Howard Univ. v. Green*, 652 A.2d 41, 45–47 (D.C.1994).[20] The plaintiff engaged in protected activity, for purposes of Title VII's opposition clause, if she opposed conduct that she reasonably believed to violate Title VII. *See, e.g., id.* at 46; *Parker, supra*, 209 U.S.App.D.C. at 222, 652 F.2d at 1019. Protected activity need not take the form of a lawsuit or of a formal complaint to an enforcement agency such as the EEOC or the OHR. On the contrary, the protections of Title VII extend to an employee's informal complaints of discrimination to his or her superiors within the

---

**19.** Where the claim of protected activity is based on a mistaken belief, however, "[t]he mistake must, of course, be a sincere one; and presumably it must be reasonable[.] ... [I]t seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them." *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982) (citation omitted).

**20.** *Green* arose under the DCHRA's prohibition against retaliatory employer conduct rather than under Title VII's opposition clause, but the same analysis is employed under the two statutes. *E.g., Green, supra*, 652 A.2d at 45 n. 3; *Arthur Young, supra*, 631 A.2d at 368.

organization. *See, e.g., Parker, supra,* 209 U.S.App.D.C. at 222, 652 F.2d at 1019. In fact, internal complaints have been held to constitute "clearly protected activity." *McKenna, supra,* 234 U.S.App.D.C. at 305, 729 F.2d at 791; *see also Goos, supra,* 715 F.Supp. at 4; *cf. Green, supra,* 652 A.2d at 46–47 (examining employees' complaints to their superiors at Howard University to determine whether these complaints were protected).

■■■ A plaintiff claiming retaliation must also demonstrate that he or she "voice[d the] complaint about ... the allegedly unlawful activity." *Green, supra,* 652 A.2d at 46. In other words, the plaintiff is required to "alert the employer [and make the employer aware of the fact] that [he or] she is lodging a complaint about allegedly discriminatory conduct." *Id.* The employee need not, however, employ any "magic words" such as "discrimination," for "the communication of a complaint of unlawful discrimination ... may be *inferred or implied*" from the surrounding facts. *Id.* at 47 (emphasis in original, citations omitted).

In this case, neither trial judge explicitly focused on the question when the plaintiff first "opposed" a discriminatory practice within the meaning of Title VII's opposition clause. Judge Satterfield's evidentiary rulings, however, presuppose that protected activity first occurred in August 1994, and not December 1992. Judge Winfield, apparently viewing herself as bound by "the law of the case," adopted Judge Satterfield's implicit ruling. To the extent that both trial judges appear to have assumed that the plaintiff was not engaged in activity protected by the opposition clause until she filed her complaint with the OHR, we cannot agree with that assumption. *See, e.g., Parker, supra,* 209 U.S.App.D.C. at 222, 652 F.2d at 1019.

■■■ The plaintiff's December 15, 1992 memorandum satisfied all of the prerequisites for protected activity. In that memorandum, the plaintiff communicated to Dr.

Harper and to university management, including Dean Hoover and Vice President Ladner, her allegation that Dr. Harper was unlawfully discriminating against her on the basis of sex. She made specific reference to Dr. Harper's "sexist mentality," and she stated that she would "not hesitate to seek advice and/or redress outside the University if [Dr. Harper's] sexism ... do[es] not cease." "[S]exism" is defined as "[d]iscrimination based on gender, especially discrimination against women." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1654 (3d ed.1992). The plaintiff's references to "sexism" and a "sexist mentality," combined with her allusion to possible redress, would therefore put any reasonable employer on notice that she was complaining of or "opposing" discrimination in employment based on sex, that is, conduct which, if it occurred, constituted an unlawful employment practice under Title VII. 42 U.S.C. § 2000e–2 (a)(1).

It is true that the memorandum did not specifically refer to "discrimination" but, as we have noted, no such talismanic language was required. *Green, supra,* 652 A.2d at 47. Indeed, "[c]ourts have not imposed a rigorous requirement of specificity in determining whether an act constitutes 'opposition' for purposes of [the opposition clause]." *E.E.O.C. v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1013 (9th Cir.1983). Given this relatively lenient standard, the conclusion is inescapable that the plaintiff's December 1992 memorandum was a complaint about sexually discriminatory conduct. That Dr. Carter-Obayuwana considered that conduct unlawful can reasonably be inferred from her expressed intention, if necessary, to seek outside assistance or redress. Consequently, the plaintiff's memorandum constituted protected "opposition" on her part to alleged discriminatory practices. *See Parker, supra,* 209 U.S.App.D.C. at 222, 652 F.2d at 1019.

■■■ This case is unlike *Green, supra,* 652 A.2d 41, in which we held that the

plaintiff's internal complaints did not constitute protected activity. In *Green*, a suit alleging employment discrimination against heterosexuals, the plaintiff had "never complained to anyone at Howard University about the existence of sexual orientation discrimination until she filed her lawsuit." *Id.* at 46. Specifically, the plaintiff had never "expressly [told] ... any higher Howard University management official" of the allegedly discriminatory conduct to which she claimed to have been subjected. *Id.* (citation omitted). In this case, on the other hand, Dr. Carter–Obayuwana not only complained to Dr. Harper about his alleged "sexism," but also reported her complaint to "higher Howard University management official[s]." *Id.* The plaintiff's claim of sexually discriminatory conduct was made several months before the University's decision to reduce her salary, and she continued to complain to management about Dr. Harper's actions in subsequent communications to Dr. Cash and Dr. Ladner in August and September of 1993. In our view, this case is more analogous to *McKenna, supra,* in which the court held that a female employee's complaints to management regarding her co-workers' allegedly sexist treatment of her was held to be "clearly protected activity," 234 U.S.App. D.C. at 305, 729 F.2d at 791, than to *Green.*[21] *See also Goos, supra,* 715 F.Supp. at 4 (holding that an employee engaged in protected activity when she orally complained to her superiors that the termination of a non-white employee that she had been instructed to effectuate was "unethical" and seemingly "racially motivated").[22]

The other two elements that an employee must establish to present a prima facie case of retaliation, namely, adverse action and causation, *McKenna, supra,* 234 U.S.App.D.C. at 304, 729 F.2d at 790, need not detain us long. There can be no doubt that an improperly motivated reduction in salary was adverse to the plaintiff. *See Schoffstall v. Henderson,* 223 F.3d 818, 825 (8th Cir.2000). The existence *vel non* of a causal nexus between the plaintiff's protected activity and the reduction of her salary may well be a hotly contested issue at trial.[23] At this

---

21. In *McKenna,* the Court of Appeals ruled that the plaintiff had made out a *prima facie* case of retaliation, but ultimately concluded that the trial court's finding of "no retaliation" was not clearly erroneous. *McKenna, supra,* 234 U.S.App.D.C. at 305, 729 F.2d at 791. Unlike the present case, *McKenna* did not involve a jury trial, and the judge was the trier of fact.

22. Noting Judge Satterfield's implicit holding at the first trial that the plaintiff had not engaged in protected activity until she complained to the OHR in 1994, the University asks us to uphold, under the doctrine of the law of the case, Judge Winfield's holding to the same effect at the second trial. But regardless of whether or not Judge Winfield was required to follow Judge Satterfield's apparent disposition of the issue, we as an appellate court obviously are not bound by the Superior Court's action. On appeal, the proper inquiry is whether the second trial judge's ultimate disposition was correct, and not whether that ruling was consistent with the first trial judge's holding. *See, e.g., Guilford Transp. Indus. v. Wilner,* 760 A.2d 580, 593–94 (D.C.2000).

23. The University claims that the reduction in the plaintiff's salary was not in retaliation for her complaints about sexually discriminatory treatment by Dr. Harper, but rather a legitimate response to her insubordination in refusing to teach the Vocational Theories class. We agree that the University has "articulate[d] a legitimate, nondiscriminatory reason" for the salary reduction, which, if true, would satisfy the required second step in the analysis of a retaliation claim. *McKenna, supra,* 234 U.S.App.D.C. at 304, 729 F.2d at 790. But under the *McDonnell–Douglas* standard, as applied to retaliation cases, the plaintiff is entitled to an opportunity, which she has not heretofore been afforded, to "prove by a preponderance of the evidence that the proffered reason was but a pretext for retaliation." *McKenna, supra,* 234 U.S.App.D.C. at 304, 729 F.2d at 790. In *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the Supreme Court held that a "factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination."

stage of the case, however, we are satisfied that the plaintiff's evidence, which includes testimony that she repeatedly complained of retaliatory treatment (one of her complaints having been made only two days before the salary reduction was officially recommended), was sufficient to go to the jury. *See Arthur Young, supra,* 631 A.2d at 368 ("The causal connection may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.") (alterations, quotation marks, and citation omitted). "This temporal proximity is enough to survive summary judgment," *Goos, supra,* 715 F.Supp. at 4, or, as in this case, to avert the direction of an unfavorable verdict. Moreover, the record, viewed in the light most favorable to the plaintiff, could fairly be construed as supporting the claim in her brief that "Frederick Harper's own words reflect a particularly thin skin towards plaintiff's protected complaints, deriding them as 'disruptive and accusatory behaviors' and 'libelous statements' and 'threats' in memoranda to his colleagues."

Lest we be misunderstood, we emphasize that we are expressing no opinion as to whether the plaintiff will be able to establish, at trial, that the reduction of her salary was in fact retaliatory. Cases like this one present the opportunity for posturing by plaintiffs and defendants alike. A malcontent with no valid grievance can pose as a victim of invidious discrimination, and may sometimes trivialize, thwart, or even pervert the noble aims of our civil rights laws. By the same token, an unscrupulous employer who has engaged in discriminatory practices may sometimes falsely depict a person with a legitimate complaint as a meritless trouble-maker; the effects of the employer's wrongful conduct may then be compounded by the undeserved *ad hominem* condemnation of

and calumny against a plaintiff who deserves better. However that may be, these issues can only be sorted out at trial. There, cross-examination and other tools of the search for truth should enable the court and jury to separate the wheat from the chaff and reach a just result. In this case, in our view, the plaintiff should have been permitted to present to the jury her claims regarding the 1993 reduction of her salary.

### C. *The motion to consolidate.*

The plaintiff also contends that Judge Winfield erred in denying the plaintiff's motion to consolidate the present action with her second complaint—No. 98–8611—which she filed in November 1998. The reader will recall that in the second complaint, the plaintiff alleged that she had been subjected to additional acts of retaliation which were said to have occurred after the first trial of the present case in 1997. We discern no error on Judge Winfield's part in denying the motion to consolidate. We note, however, that the judge's ruling has been overtaken by events, and that on remand the trial court will face a situation materially different from the one which confronted Judge Winfield when the original motion was filed and denied.

The plaintiff asked the court to consolidate her two suits on February 6, 1999. The motion was based on Rule 42(a) of the Superior Court's Rules of Civil Procedure, which provides in pertinent part:

> When actions involving a common question of law or fact are pending before the Court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

In this case, the plaintiff claims that the order which she concededly disobeyed—namely, that she teach the Vocational Theories course—was itself issued suddenly and belatedly, at a time especially inconvenient to

her, as a reprisal against her complaints of discriminatory treatment. The issue of pretext, and other related issues, must be resolved at trial.

The two actions brought by Dr. Carter–Obayuwana potentially presented common questions of law and fact, and some or all of the evidence in each case may well have been admissible in the other. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir.1990). As the Supreme Court explained in *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 n. 6, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960) (quoting *Axelson Mfg. Co.*, 88 N.L.R.B. 761, 766 (1950)),

> [e]vents obscure, ambiguous, or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive, and informative when considered in relation to other action. Conduct, like language, takes its meaning from the circumstances in which it occurs.

*Accord, Wallace, supra,* 715 A.2d at 878 n. 4; *Clark v. United States,* 593 A.2d 186, 195 (D.C.1991). In discrimination cases, as in others, it is generally in the interests of justice that the trier of fact "consider the entire mosaic." *Tyree v. Evans,* 728 A.2d 101, 106 (D.C.1999) (citation omitted). The evidence in the second case might well shed light on the issues in the first, and vice versa.

▮▮ But when the plaintiff moved to consolidate the two actions, discovery in the second case had not yet been completed. If the judge had granted the motion, she might well have been compelled either to postpone the trial in the first case or to force the University to proceed to trial without an adequate opportunity to conduct discovery or to prepare properly for barristerial combat. The judge could reasonably conclude that further delay, in a case which turned in part on events that had occurred more than six years earlier, was not justified,[24] and that forcing an unprepared defendant to trial would be unfair. The "question of consolidation is a decision in which the [trial] court has great latitude and . . . its ruling thereon is not to be disturbed on appeal except for an abuse of discretion." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 287–88 (D.C.1977). On these facts, we are not prepared to second-guess Judge Winfield's exercise of her broad discretion.

We have been advised, however, that the plaintiff's second suit was stayed pending the disposition of the present appeal, and that it is presently scheduled for trial in April 2001. The factors that informed the judge's exercise of discretion in 1999 may no longer exist in 2001. We therefore direct that on remand, the trial court give further consideration to the plaintiff's motion to consolidate in light of the changed circumstances and in conformity with the authorities cited in this opinion. See 791–93, *supra.* If, as seems probable, the evidence in the two cases would be reciprocally admissible, and if the two cases are at comparable stages of advancement, it may constitute "good judicial husbandry," *Lawlor v. District of Columbia,* 758 A.2d 964, 974 (D.C.2000) (citation and alteration omitted), to avoid duplication by holding a single trial rather than two.

### III.

### CONCLUSION

For the foregoing reasons, the judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

24. The University represents in its brief that by early 1999, it "had already lost the benefit of certain key witnesses due to resignations and retirements." Justice delayed may, indeed, be justice denied.